# DAWSON *v.* DELAWARE

No. 90–6704.   Argued November 12, 1991—Decided March 9, 1992

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, STEVENS, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 169. THOMAS, J., filed a dissenting opinion, *post*, p. 169.

*Bernard J. O'Donnell* argued the cause for petitioner. With him on the briefs was *Brian J. Bartley.*

*Richard E. Fairbanks, Jr.,* argued the cause for respondent. With him on the brief were *Charles M. Oberly III,* Attorney General of Delaware, and *Gary A. Myers* and *Loren C. Meyers,* Deputy Attorneys General.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented in this case is whether the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of an organization called the Aryan Brotherhood, where the evidence has no relevance to the issues being decided in the proceeding. We hold that they do.

Shortly after midnight on December 1, 1986, petitioner David Dawson and three other inmates escaped from the Delaware Correctional Center near Smyrna, Delaware. Dawson stole a car and headed south, while the other three inmates stole another car and drove north. Early that

*Michael A. Bamberger, Stuart Altschuler, John A. Powell, Steven R. Shapiro,* and *Jonathan Lang* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

*Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Robert A. Long, Jr.,* filed a brief for the United States as *amicus curiae* urging affirmance.

morning, Dawson burglarized a house near Kenton, Delaware, stealing a motorcycle jacket, several pocket watches, and containers of loose change. He then proceeded to the home of Richard and Madeline Kisner, located about half a mile from the burglary site. Mrs. Kisner was alone in the house, preparing to leave for work. Dawson brutally murdered Mrs. Kisner, stole the Kisners' car and some money, and fled further south.

He reappeared later that evening at the Zoo Bar in Milford, Delaware, wearing a motorcycle jacket that was too big for him. While at the bar, Dawson introduced himself to Patty Dennis, and told her that his name was "Abaddon," which he said meant "[o]ne of Satan's disciples." App. 80–81. Dawson was subsequently asked to leave the bar. Later that evening, a Delaware state police officer responded to a call to investigate a one-car accident. The car involved in the accident had been stolen from a location near the Zoo Bar and had been driven into a ditch, but the driver had left the scene. The police began a house-to-house search for Dawson, and found him at 5:25 the next morning, on the floor of a Cadillac parked about three-tenths of a mile from the accident site.

A jury convicted Dawson of first-degree murder, possession of a deadly weapon during the commission of a felony, and various other crimes. The trial court then conducted a penalty hearing before the jury to determine whether Dawson should be sentenced to death for the first-degree murder conviction. See Del. Code Ann., Tit. 11, § 4209 (1987). The prosecution gave notice that it intended to introduce (1) expert testimony regarding the origin and nature of the Aryan Brotherhood, as well as the fact that Dawson had the words "Aryan Brotherhood" tattooed on the back of his right hand, (2) testimony that Dawson referred to himself as "Abaddon" and had the name "Abaddon" tattooed in red letters across his stomach, and (3) photographs of multiple swastika tattoos on Dawson's back and a picture of a swastika he had painted

on the wall of his prison cell.  Dawson argued that this evidence was inflammatory and irrelevant, and that its admission would violate his rights under the First and Fourteenth Amendments.

Before the penalty phase began, the parties agreed to a stipulation regarding the Aryan Brotherhood evidence.  The stipulation provided:

> "The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities.  Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware."  App. 132.

In return for Dawson's agreement to the stipulation, the prosecution agreed not to call any expert witnesses to testify about the Aryan Brotherhood.  Although Dawson agreed to the stipulation in order to avoid presentation of this expert testimony, it is apparent from the record and from the opinion of the Supreme Court of Delaware that he continued to assert that the admission of the stipulated facts into evidence violated the Constitution.  581 A. 2d 1078 (1990).  At the penalty hearing, the prosecution read the stipulation to the jury and introduced evidence that Dawson had tattooed the words "Aryan Brotherhood" on his hand.  The trial judge permitted the prosecution to present the evidence related to the name "Abaddon" as well, but excluded all of the swastika evidence.  In addition, the prosecution submitted proof of Dawson's lengthy criminal record.  Dawson, in turn, presented mitigating evidence based on the testimony of two family members and on the fact that he had earned good time credits in prison for enrolling in various drug and alcohol programs.  The jury found three statutory aggravating circumstances, each making Dawson eligible for the death penalty under Delaware law; it determined (1) that the murder was committed by an escaped prisoner, (2) that the murder was committed during the commission of a burglary, and (3)

that the murder was committed for pecuniary gain. See *id.*, at 1102, and n. 27. The jury further concluded that the aggravating evidence outweighed the mitigating evidence, and recommended that Dawson be sentenced to death. The trial court, bound by that recommendation, imposed the death penalty.

The Supreme Court of Delaware affirmed the convictions and the death sentence. The court rejected Dawson's claim that the evidence concerning the Aryan Brotherhood and his use of the name "Abaddon" should have been excluded from the penalty hearing. It observed that having found at least one statutory aggravating factor, the jury was "required to make an *individualized* determination of whether Dawson should be executed or incarcerated for life, based upon Dawson's character, his record and the circumstances of the crime," and that it was desirable for the jury to have as much information before it as possible when making that decision. *Id.*, at 1102–1103 (emphasis in original). The court acknowledged that the Constitution would prohibit the consideration of certain irrelevant factors during the sentencing process, but stated that " '[p]unishing a person for expressing his views or for associating with certain people is substantially different from allowing . . . evidence of [the defendant's] character [to be considered] where that character is a relevant inquiry.' " *Id.*, at 1103. Because the evidence relating to the Aryan Brotherhood and the name "Abaddon" properly focused the jury's attention on Dawson's character, and did not appeal to the jury's prejudices concerning race, religion, or political affiliation, the court upheld its introduction during the penalty phase. We granted certiorari, 499 U. S. 946 (1991), to consider whether the admission of this evidence was constitutional error. We hold that its admission in this case was error and so reverse.

We have held that the First Amendment protects an individual's right to join groups and associate with others holding similar beliefs. See *Aptheker* v. *Secretary of State,* 378

U. S. 500, 507 (1964); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 460 (1958). Because his right to associate with the Aryan Brotherhood is constitutionally protected, Dawson argues, admission of evidence related to that association at his penalty hearing violated his constitutional rights. Relying on our statement in *Zant* v. *Stephens*, 462 U. S. 862 (1983), that an aggravating circumstance is invalid if "it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected," he contends that the Constitution forbids the consideration in sentencing of any evidence concerning beliefs or activities that are protected under the First Amendment. *Id.*, at 885.

We think this submission is, in the light of our decided cases, too broad. These cases emphasize that "the sentencing authority has always been free to consider a wide range of relevant material." *Payne* v. *Tennessee*, 501 U. S. 808, 820–821 (1991); *United States* v. *Tucker*, 404 U. S. 443, 446 (1972) ("[A] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come"); *Williams* v. *New York*, 337 U. S. 241 (1949). We have previously upheld the consideration, in a capital sentencing proceeding, of evidence of racial intolerance and subversive advocacy where such evidence was relevant to the issues involved. In *Barclay* v. *Florida*, 463 U. S. 939 (1983), for example, we held that a sentencing judge in a capital case might properly take into consideration "the elements of racial hatred" in Barclay's crime as well as "Barclay's desire to start a race war." See *id.*, at 949 (plurality opinion); *id.*, at 970, and n. 18 (STEVENS, J., concurring in judgment).

One year later, in *United States* v. *Abel*, 469 U. S. 45 (1984), we held that the Government could impeach a defense witness by showing that both the defendant and the witness were members of the Aryan Brotherhood, and that members were sworn to lie on behalf of each other. We held the evidence admissible to show bias, even assuming that member-

ship in the organization was among the associational freedoms protected by the First Amendment. Though *Abel* did not involve a capital sentencing proceeding, its logic is perfectly applicable to such a proceeding. We therefore conclude that the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment.

Although we cannot accept Dawson's broad submission, we nevertheless agree with him that, in this case, the receipt into evidence of the stipulation regarding his membership in the Aryan Brotherhood was constitutional error. Before the penalty hearing, the prosecution claimed that its expert witness would show that the Aryan Brotherhood is a white racist prison gang that is associated with drugs and violent escape attempts at prisons, and that advocates the murder of fellow inmates. If credible and otherwise admissible evidence to that effect had been presented, we would have a much different case. But, after reaching an agreement with Dawson, the prosecution limited its proof regarding the Aryan Brotherhood to the stipulation. The brief stipulation proved only that an Aryan Brotherhood prison gang originated in California in the 1960's, that it entertains white racist beliefs, and that a separate gang in the Delaware prison system calls itself the Aryan Brotherhood. We conclude that the narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding.

As an initial matter, the second sentence of the stipulation, when carefully parsed, says nothing about the beliefs of the Aryan Brotherhood "chapter" in the Delaware prisons. Prior to trial, the prosecution acknowledged that there are differences among the various offshoots of the Aryan Brotherhood, stating that "there are cells or specific off-shoots within various local jurisdictions that don't see eye to eye or share a union, if you will." App. 33. But the juxtaposition

of the second sentence with the first sentence, which describes the Aryan Brotherhood in California prisons as a "white racist prison gang," invited the jury to infer that the beliefs of the Delaware chapter are identical to those of the California chapter.

Even if the Delaware group to which Dawson allegedly belongs is racist, those beliefs, so far as we can determine, had no relevance to the sentencing proceeding in this case. For example, the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim. In *Barclay*, on the contrary, the evidence showed that the defendant's membership in the Black Liberation Army, and his consequent desire to start a "racial war," were related to the murder of a white hitchhiker. See 463 U. S., at 942–944 (plurality opinion). We concluded that it was most proper for the sentencing judge to "tak[e] into account the elements of racial hatred in this murder." *Id.*, at 949. In the present case, however, the murder victim was white, as is Dawson; elements of racial hatred were therefore not involved in the killing.

Because the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance. In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future. Other evidence concerning a defendant's associations might be relevant in proving other aggravating circumstances. But the inference which the jury was invited to draw in this case tended to prove nothing more than the abstract beliefs of the Delaware chapter. Delaware counters that even these abstract beliefs constitute a portion of

Dawson's "character," and thus are admissible in their own right under Delaware law. Del. Code Ann., Tit. 11, § 4209(d) (1987). Whatever label is given to the evidence presented, however, we conclude that Dawson's First Amendment rights were violated by the admission of the Aryan Brotherhood evidence in this case, because the evidence proved nothing more than Dawson's abstract beliefs. Cf. *Texas* v. *Johnson*, 491 U. S. 397, 414 (1989) ("[T]he government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). Delaware might have avoided this problem if it had presented evidence showing more than mere abstract beliefs on Dawson's part, but on the present record one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible. Because Delaware failed to do more, we cannot find the evidence was properly admitted as relevant character evidence.

Nor was the Aryan Brotherhood evidence relevant to rebut any mitigating evidence offered by Dawson. We have held that a capital defendant is entitled to introduce any relevant mitigating evidence that he proffers in support of a sentence less than death. *Eddings* v. *Oklahoma*, 455 U. S. 104, 114 (1982); *Lockett* v. *Ohio*, 438 U. S. 586 (1978) (plurality opinion). But just as the defendant has the right to introduce any sort of relevant mitigating evidence, the State is entitled to rebut that evidence with proof of its own. See *Payne* v. *Tennessee*, 501 U. S., at 825 ("[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in") (internal quotation marks omitted); *id.*, at 860 (STEVENS, J., dissenting). In this case, Dawson's mitigating evidence consisted of testimony about his kindness to family members, as well as evidence regarding good time credits he earned in prison for enrolling in various drug and alcohol programs. Delaware argues that because Dawson's evidence consisted of "good" character evidence, it was entitled to introduce any "bad" character

evidence in rebuttal, including that concerning the Aryan Brotherhood. The principle of broad rebuttal asserted by Delaware is correct, but the argument misses the mark because, as stated above, the Aryan Brotherhood evidence presented in this case cannot be viewed as relevant "bad" character evidence in its own right.

The dissent takes us to task for failing to recognize the broader implications of membership in a prison gang, and for extending the protection of the First Amendment to evidence introduced at a sentencing hearing. The material adduced by the dissent as to the nature of prison gangs—similar to the evidence which the prosecution in this case at one time considered adducing by expert testimony, *supra*, at 165—would, if it had been presented to the jury, have made this a different case. But we do not have the same confidence as the dissent does that jurors would be familiar with the court decisions and studies upon which it relies. Regarding the reach of the First Amendment, the dissent correctly points out that it prevents the State from criminalizing certain conduct in the first instance. But it goes further than that. It prohibits a State from denying admission to the bar on the grounds of previous membership in the Communist Party, when there is no connection between that membership and the "good moral character" required by the State to practice law. *Schware* v. *Board of Bar Examiners of N. M.*, 353 U. S. 232 (1957). It prohibits the State from requiring information from an organization that would impinge on First Amendment associational rights if there is no connection between the information sought and the State's interest. *Bates* v. *Little Rock*, 361 U. S. 516 (1960); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449 (1958). We think that it similarly prevents Delaware here from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried.

The question whether the wrongful admission of the Aryan Brotherhood evidence at sentencing was harmless

error is not before us at this time, and we therefore leave it open for consideration by the Supreme Court of Delaware on remand.   See *Clemons* v. *Mississippi,* 494 U. S. 738 (1990).

For the foregoing reasons, we vacate the judgment of the Supreme Court of Delaware and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring.

I join the Court's opinion, but write separately to note my understanding that the Court, by the penultimate paragraph of its opinion, *ante,* at 168–169, does not *require* application of harmless-error review on remand.

This Court previously has declined to apply harmless-error analysis to certain categories of constitutional error. See, *e. g., Batson* v. *Kentucky,* 476 U. S. 79, 100 (1986) (racial discrimination in the selection of a petit jury); *Vasquez* v. *Hillery,* 474 U. S. 254, 261–262 (1986) (racial discrimination in the selection of a grand jury); *Waller* v. *Georgia,* 467 U. S. 39, 49–50, and n. 9 (1984) (right to a public trial); *Tumey* v. *Ohio,* 273 U. S. 510, 535 (1927) (trial before an impartial judge).   Because of the potential chilling effect that consideration of First Amendment activity at sentencing might have, there is a substantial argument that harmless-error analysis is not appropriate for the type of error before us today.   See *Rose* v. *Clark,* 478 U. S. 570, 587 (1986) (STEVENS, J., concurring in judgment) ("[V]iolations of certain constitutional rights are not, and should not be, subject to harmless-error analysis because those rights protect important values that are unrelated to the truth-seeking function of the trial").   The parties did not address this issue, and it is better left for the Supreme Court of Delaware on remand.

JUSTICE THOMAS, dissenting.

To rebut mitigating character evidence introduced by petitioner Dawson at his capital sentencing hearing, the State of Delaware proved that Dawson belonged to the Aryan Broth-

erhood prison gang. The Court holds that the gang membership evidence "ha[d] no relevance to the issues being decided in the proceeding" and that admission of the evidence violated the First Amendment. *Ante,* at 160. I respectfully dissent.

I

Dawson's membership in the Aryan Brotherhood prison gang had relevance at sentencing. Under Delaware law, after a jury finds a statutory aggravating factor, it may consider "all relevant evidence in aggravation or mitigation" relating to either the crime or the "character and propensities" of the defendant. Del. Code Ann., Tit. 11, § 4209(d)(1) (1987). Under this provision, Dawson's character became an issue in determining whether he should receive the death penalty.

To prove his good character, as the Court observes, Dawson introduced evidence that he had acted kindly toward his family and that he had earned good time credits while in prison. *Ante,* at 162. Dawson also introduced evidence of his membership and participation in various respectable organizations, including the Green Tree Program (described only as a "drug and alcohol program"), Alcoholics Anonymous (not described at all), and certain therapy and counseling groups (also not described at all). App. 79. Dawson did not call any expert witnesses to clarify the nature of these organizations or their activities.

The State attempted to rebut Dawson's mitigating character evidence in part by showing that Dawson also belonged to a prison gang called the Aryan Brotherhood. A stipulation read to the jury explained:

"The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." *Id.,* at 132.

I do not consider the evidence of Dawson's gang membership irrelevant to his character.

## A

The Court asserts that the gang membership evidence had no relevance because it did nothing more than indicate Dawson's "abstract" racist "beliefs." *Ante,* at 167. The Court suggests that Dawson's membership in a prison gang would be relevant if the gang had endorsed or committed "unlawful or violent acts" such as drug use, escape, or the murder of other inmates. *Ante,* at 165, 166. Yet, because the State failed to prove the Aryan Brotherhood's activities, the Court reasons, the jury could do no more than infer that Dawson shared the gang's racist beliefs. *Ibid.* I disagree. In my judgment, a jury reasonably could conclude from Dawson's membership in a prison gang that he had engaged in some sort of forbidden activities while in prison. The evidence also tended to establish future dangerousness and to rebut Dawson's attempt to show that he was kind to others.

Jurors do not leave their knowledge of the world behind when they enter a courtroom and they do not need to have the obvious spelled out in painstaking detail. Just as defense counsel may assume when introducing mitigating evidence that a jury understands the nature of a church choir, a softball team, or the Boy Scouts, so too may a prosecutor assume when rebutting this evidence that a jury knows the nature of a prison gang. The concept of a prison gang is not so mysterious that it requires an encyclopedic definition or a greater explanation than any of the other organizations to which Dawson belonged, such as Alcoholics Anonymous or the Green Tree Program. Cf. *Jones* v. *Hamelman,* 869 F. 2d 1023, 1028 (CA7 1989) (testimony of a purported expert unnecessary to explain a prison gang once the record established its existence); United States Dept. of Justice, Prison Gangs: Their Extent, Nature and Impact on Prisons 10 (1985) (discussing the "extensive" media coverage of prison gangs).

In stating that Dawson belonged to a prison gang, the stipulation implied much more than that he shared the gang's abstract racist creed; it indicated that Dawson had engaged in prison gang activities, and that he had the character of a person who engages in these activities.

> "One of the distinguishing characteristics of the prison gang is the virtual absence of any non-criminal, non-deviant activities. Gang members engage in some institutional pastimes, weight lifting being one of the more notable, but in general their activities are criminal or deviant in nature. The gang member is completely immersed in being a career prison gangster, leaving little time and less inclination for other than asocial behavior." U. S. Dept. of Justice, *supra*, at x–xi.

Denying that Dawson's gang membership told the jury anything about his activities, tendencies, and traits—his "character"—ignores reality. What Judge Easterbrook remarked when others attempted to distinguish gang membership from gang activities, someone reading the Court's opinion might say today:

> "Who do they think they are fooling? What elements of 'membership'—as opposed to 'activity'—take place [in the prison]? What are prison gangs for, except to engage in forbidden 'activity'? Surely [they] do not believe that prison gangs meet every month to discuss *The Critique of Pure Reason* and debate how Stanley Tigerman's buildings differ from those of the Bauhaus school. Gangs affiliate for mutual support, but not the kind contemplated by the National Labor Relations Act." *David K.* v. *Lane*, 839 F. 2d 1265, 1278 (CA7 1988) (concurring opinion).

In my view, the stipulation was relevant to Dawson's character because it explained that the Aryan Brotherhood was a prison gang and that Dawson was a member. That evidence, I submit, supports an inference that while in prison,

Dawson engaged in the kind of unlawful activity mentioned by the Court.[1]

The description of the Aryan Brotherhood as a "racist" prison gang conveyed additional information about Dawson's character.  In *Barclay* v. *Florida*, 463 U. S. 939 (1983), the plurality found it relevant that a black gang conspired not merely to commit crimes, but to commit them against white persons out of racial hatred.  See *id.*, at 949.  Even if Dawson's white racist prison gang does not advocate "the murder of fellow inmates," *ante*, at 165, a jury reasonably could infer that its members in one way or another act upon their racial prejudice.  The stipulation itself makes clear that the Aryan Brotherhood does not exist merely to facilitate formulation of abstract racist thoughts, but to "respon[d]" to gangs of racial minorities.  The evidence thus tends to establish that Dawson has not been "a well-behaved and well-adjusted prisoner," *Skipper* v. *South Carolina*, 476 U. S. 1, 4 (1986), which

---

[1] Indeed, in the case of an organization claiming to be part of the Aryan Brotherhood, the jury very well may not have needed even the explanation that the stipulation provided.  Courts regularly have noticed that the Aryan Brotherhood is "a singularly vicious prison gang," *United States* v. *Fountain*, 840 F. 2d 509, 516 (CA7 1988) (Easterbrook, J.) (citing other cases), that it has a "hostility to black inmates," *United States* v. *Silverstein*, 732 F. 2d 1338, 1341 (CA7 1984) (Posner, J.) (citing secondary sources), and that it originated "during the prison racial violence of the 1960's," *United States* v. *Mills*, 704 F. 2d 1553, 1555 (CA11 1983).  The Aryan Brotherhood gangs also have received substantial attention in both popular and scholarly writings.  See, *e. g.*, Matthee, Stronger Prison Gang Influence Cited, L. A. Times, July 10, 1987, part 1, p. 34, col. 1 (describing members of the Aryan Brotherhood as "among the most violent prisoners"); Goodgame, Mayhem in the Cellblocks, Time, Aug. 12, 1985, p. 20 (describing the Aryan Brotherhood's "inflexible ethic of vengeance"); J. Fox, Organizational and Racial Conflict in Maximum-Security Prisons 136 (1982) (identifying the Aryan Brotherhood as an "extremist" organization like the Ku Klux Klan); United States Dept. of Justice, Prison Gangs: Their Extent, Nature and Impact on Prisons 65–190 (1985) (discussing the activities of the Aryan Brotherhood in the prisons of 14 States).  Even if the jury were unaware of the Aryan Brotherhood in particular, it was surely aware of the nature of prison gangs generally.

itself is an indication of future dangerousness, see *Franklin* v. *Lynaugh,* 487 U. S. 164, 178 (1988) (plurality opinion); *id.,* at 186 (O'CONNOR, J., concurring in judgment).

The stipulation also tends to rebut Dawson's evidence of good character. In capital cases, we have held that the sentence imposed should reflect a "'reasoned moral response'" not only to the crime, but also to the "'background'" and "'character'" of the defendant himself. See *Penry* v. *Lynaugh,* 492 U. S. 302, 328 (1989) (quoting *California* v. *Brown,* 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring). In determining Dawson's "personal culpability," *Penry, supra,* at 327, the jury surely would want to know about the various activities, traits, and tendencies that distinguish him as a "uniquely individual human bein[g]," *Woodson* v. *North Carolina,* 428 U. S. 280, 304 (1976). Dawson introduced mitigating character evidence that he had acted kindly towards his family. The stipulation tended to undercut this showing by suggesting that Dawson's kindness did not extend to members of other racial groups. Although we do not sit in judgment of the morality of particular creeds, we cannot bend traditional concepts of relevance to exempt the antisocial.

B

The Court's opinion suggests that the Constitution now imposes a double standard for determining relevance: a standard easy for defendants to satisfy, but difficult for prosecutors. Under *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982), and *Lockett* v. *Ohio,* 438 U. S. 586 (1978) (plurality opinion), a capital defendant has a right to introduce all relevant mitigating evidence. Capital defendants, as a result, regularly introduce character evidence that allows juries to consider their abstract beliefs and associational rights. Dawson, for example, introduced evidence that he associated with Alcoholics Anonymous and other groups. Other defendants have introduced comparable evidence regarding their religious practice and fraternal organizations. See, *e. g., Jordan*

v. *State*, 518 So. 2d 1186, 1188 (Miss. 1987) (membership in a church); *Sivak* v. *State*, 112 Idaho 197, 236, 731 P. 2d 192, 231 (1986) (same); *Deputy* v. *State*, 500 A. 2d 581, 598 (Del. 1985) (religious rebirth); *People* v. *Belmontes*, 45 Cal. 3d 744, 797, 755 P. 2d 310, 340 (1988) (same); *Evans* v. *McCotter*, 790 F. 2d 1232, 1242, and n. 10 (CA5 1986) (conversion to Christianity); *State* v. *Beuke*, 38 Ohio St. 3d 29, 43, 526 N. E. 2d 274, 289 (1988) (former membership in the Cub Scouts). I see no way to hold that this evidence has relevance, but that Dawson's gang membership does not.

A double standard for determining relevance may distort the picture presented to the jury. In this case, Dawson himself chose to introduce evidence of certain good character traits. Unless the State had responded with evidence of other, bad traits, the jury could not possibly have made a fair and balanced determination. Membership in Alcoholics Anonymous might suggest a good character, but membership in the Aryan Brotherhood just as surely suggests a bad one. The jury could not have assessed Dawson's overall character without both.

Just last Term, in *Payne* v. *Tennessee*, 501 U. S. 808 (1991), the Court condemned a similar distortion. Overruling *Booth* v. *Maryland*, 482 U. S. 496 (1987), and *South Carolina* v. *Gathers*, 490 U. S. 805 (1989), we held that the Eighth Amendment does not generally prohibit the introduction of victim impact evidence. See *Payne, supra,* at 827. We reasoned that allowing the jury to consider the defendant, but not the victim, would create an unbalanced picture. Quoting a dissenting opinion in *Booth,* we stated: " '[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " *Payne, supra,* at 825 (quoting *Booth,* 482 U. S., at 517 (WHITE, J., dissenting)); see also 482 U. S., at 520

(SCALIA, J., dissenting) ("Many citizens have found one-sided and hence unjust the criminal trial in which a parade of witnesses comes forth to testify to the pressures beyond normal human experience that drove the defendant to commit his crime . . . . Perhaps these sentiments do not sufficiently temper justice with mercy, but that is a question to be decided through the democratic processes of a free people, and not by the decrees of this Court"). Whatever distortion was produced in requiring an exclusive focus on the defendant's character, at least nothing in *Booth* prevented the jury—as does today's decision—from fairly and fully assessing that character.

## II

The Court acknowledges that Delaware could have avoided any First Amendment problem simply by presenting evidence that proved something more than Dawson's abstract beliefs. *Ante*, at 167. For the reasons that I have stated, I believe that Delaware has made such a showing. I therefore see no First Amendment violation under the Court's analysis. The Court, however, goes on to make several further assertions about the First Amendment that I find troubling and unnecessary in this case.

## A

Both Dawson and the State, as noted above, had a right to develop the issue of "character" at the sentencing proceeding. See Del. Code Ann., Tit. 11, § 4209(d)(1) (1987); *Eddings, supra,* at 113–114. In applying the First Amendment, however, the Court declines to decide whether abstract beliefs may constitute a portion of character. "Whatever label is given to the evidence," the Court asserts, "we conclude that Dawson's First Amendment rights were violated . . . in this case . . . ." *Ante*, at 167. As a consequence, to the extent that abstract beliefs make up part of a person's character, the decision today limits the aspects of character that sentencing authorities may consider.

We long have held that the Constitution permits courts and juries to consider character evidence in sentencing proceedings. See *Williams* v. *New York*, 337 U. S. 241, 247 (1949). Until today, we have never hinted that the First Amendment limits the aspects of a defendant's character that they may consider. To the contrary, we have emphasized that the sentencing authority "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States* v. *Tucker*, 404 U. S. 443, 446 (1972).

In *Williams*, for example, we upheld a New York law that encouraged the sentencing judge to consider evidence about the defendant's "past life, health, habits, conduct, and mental and moral propensities," 337 U. S., at 245, a phrase easily broad enough to encompass a substantial amount of First Amendment activity. Writing for the Court, Justice Black specifically identified religion and interests as sentencing considerations that may "give the sentencing judge a composite picture of the defendant." *Id.*, at 250, n. 15.

More recently, in *Franklin* v. *Lynaugh*, all five Members of the Court who addressed the issue agreed that religious activity may bear upon a defendant's character. See 487 U. S., at 186 (O'CONNOR, J., concurring in judgment) ("Evidence of . . . religious devotion might demonstrate positive character traits"); *id.*, at 190 (STEVENS, J., dissenting) ("Evidence of . . . regular church attendance" is relevant to character).[2] Although the opinions in *Franklin* endorsed

---

[2] In federal court, Federal Rule of Criminal Procedure 32(c)(2)(A) permits the presentence report following a criminal conviction to contain "information about the history and characteristics of the defendant . . . that may be helpful in imposing sentence." The Advisory Committee Note to the original version of this Rule, 18 U. S. C. App., p. 795, refers to a report that we endorsed in *Williams* v. *New York*, 337 U. S. 241, 250, n. 15 (1949): Administrative Office of the United States Courts, The Presentence Investigation Report, Pub. No. 101 (1943). This report explains: "Centuries of human experience have given testimony to the dynamic qualities of re-

consideration of religious activity as a mitigating factor, the endorsement necessarily disfavors abstention from religious activity, which the First Amendment also protects.

The Court nowhere explains why courts and juries may consider some First Amendment protected activities when assessing character, but they cannot consider others. Today's decision, moreover, does not define the boundaries of permissible inquiry into character. If the Court means that no First Amendment protected activity "ca[n] be viewed as relevant 'bad' character evidence in its own right," *ante*, at 168, then today's decision represents a dramatic shift in our sentencing jurisprudence.

## B

Once the Court concludes that the gang membership evidence "has no relevance to the issues being decided in the [sentencing] proceeding," *ante*, at 160, I also have difficulty seeing what the First Amendment adds to the analysis. If the Court considers the evidence irrelevant, the problem is not that Delaware law bases the sentencing decision on impermissible issues, but rather that Dawson may not have received a fair trial on the permissible issues in the proceeding. The Due Process Clause, not the First Amendment, traditionally has regulated questions about the improper admission of evidence.

As we stated in *Chambers* v. *Florida*, 309 U. S. 227 (1940), the requirement of due process always has protected "the weak, or . . . helpless political, religious, or racial minorities and those who differed" by ensuring that "no man's life, liberty or property be forfeited as criminal punishment for violation of [the] law until there ha[s] been a charge fairly made

---

ligion. Religion may be a significant, decisive factor in enabling an individual to overcome his difficulties." *Id.*, at 10. The report also suggests that courts consider the defendant's "fraternal and social organizations." *Ibid.* A more recent edition of this report retains comparable instructions. See Administrative Office of the United States Courts, The Presentence Investigation Report, Pub. No. 105 (1984).

and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power." *Id.*, at 236–237. We have made clear, in particular, that when a state court admits evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne* v. *Tennessee*, 501 U. S., at 825; see *Darden* v. *Wainwright*, 477 U. S. 168, 179–183 (1986).

Our decision in *Schware* v. *Board of Bar Examiners of N. M.*, 353 U. S. 232 (1957), which the Court incorrectly cites, illustrates the point. In *Schware*, the New Mexico Supreme Court denied an applicant admission to the bar on grounds that he lacked good moral character. Evidence showed that the applicant had belonged to the Communist Party 15 years earlier. The Court erroneously states that *Schware* held that admitting proof of the applicant's membership in the Communist Party violated the First Amendment. *Ante*, at 168. *Schware*, in fact, did not decide that admitting the Communist Party evidence abridged any right of free political association. See 353 U. S., at 243, n. 13. It held, instead, that the state court erred in admitting the Communist Party evidence because it had no relevance to the applicant's moral character after so many years. See *id.*, at 246. Due process, the Court concluded, prohibited the state court to find the applicant morally unfit to practice law without any relevant evidence. See *id.*, at 247.

Applying familiar evidentiary standards in Dawson's case, the trial judge recognized that the "real issue" in admitting the gang membership evidence was whether its "probative value is outweighed by the danger of unfair prejudice." App. 52. The Delaware Supreme Court, likewise, examined the record to determine whether the gang membership evidence "improperly appeal[ed] to the juror's passions and prejudices concerning race, religion, or political affiliation." 581 A. 2d 1078, 1103 (1990). The standards employed by these courts went further than the fundamental unfairness

standard stated in *Payne* and therefore satisfied the require-
ments of due process. Dawson has presented no convincing
argument, based on the record as a whole, that the courts
misapplied these standards to the facts of his case. For
these reasons, I would affirm.