STATE of Wisconsin, Plaintiff-Respondent,

v.

Dennis L. MARSH, Defendant-Appellant.†

Court of Appeals

*No. 92–1689–CR. Submitted on briefs January 15, 1993.—Decided June 9, 1993.*

(Also reported in 502 N.W.2d 899.)

†Petition to review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Glenn L. Cushing*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Paul Lundsten*, assistant attorney general.

Before Nettesheim, P.J., Brown and Snyder, JJ.

SNYDER, J. Dennis L. Marsh appeals from a judgment convicting him of first-degree intentional homicide by use of a dangerous weapon, contrary to secs. 940.01(1) and 939.63(1)(a)2, Stats.,[1] and an order denying postconviction relief. On appeal, Marsh seeks a new trial or, in the alternative, a new sentencing

---

[1] Marsh was also convicted of two counts of hostage taking while using a dangerous weapon and two counts of false imprisonment while using a dangerous weapon. On appeal, Marsh does not challenge the sufficiency of the evidence to convict him on any of these charges.

hearing. He argues that evidence demonstrating his lack of intent for the homicide was erroneously excluded at trial, which prejudiced his defense. Marsh also argues that irrelevant prejudicial information concerning his religious and political beliefs, protected by the first amendment, was erroneously included in his presentence report. Because we conclude that the errors complained of by Marsh at trial and sentencing were harmless, we affirm.

On October 7, 1990, Marsh entered the apartment of his estranged wife, Cinthia, in violation of a domestic restraining order. According to the testimony of Marsh's stepdaughter and one of his two sons, Marsh entered armed with a gun, struck Cinthia on the nose with the gun, and ordered Cinthia and all three children into the bedroom. Marsh refused to allow anyone to leave, but ordered his stepdaughter to retrieve a bulletproof vest from his car and not to talk to anyone in the process. Marsh held Cinthia by her hair with a gun to her head and threatened to shoot her if his directions were not obeyed.

Marsh stayed overnight, and the next day he refused to allow the children to go to school or Cinthia to go to work. Marsh ordered his stepdaughter to perform various errands, including mailing letters at the post office. Again, as was the case throughout the incident, Marsh held Cinthia by the hair with the gun to her head and threatened to shoot her if his stepdaughter talked to anyone. Each time his stepdaughter returned, Marsh stood near the door and behind Cinthia with the gun pointed at her head.

One of the envelopes Marsh had his stepdaughter mail was addressed to his brother and contained two letters that had been written months before Marsh took his family hostage. The letters described Marsh's

relationship with Cinthia and his children, and resembled a last will in which Marsh informed his brother that he may not survive and asked him to take care of his two boys and his belongings after his death. In one letter Marsh wrote, "Cindy and the system have ended my never-ending attempts to heal myself. . . . Cindy and the system took my boys. I know it's selfish, but I feel I must 'take away,' too."

After Marsh's stepdaughter returned from the post office, a co-worker of Cinthia called to ask why she had not come to work. While Cinthia talked with her, Marsh held the gun to her neck. Since the co-worker believed that Cinthia sounded strange on the phone, the police were called to check on her welfare. After a long standoff with police, Marsh allowed the children to leave. As they left the apartment, a sheriff saw Marsh standing behind Cinthia, wearing his bullet-proof vest and an army helmet, with the gun pointed at her head. Approximately five minutes after the children were released, police heard a single gunshot. When they forced the door open they saw Marsh kneeling over Cinthia with the gun in his hand. Expert testimony revealed that the gun was in full contact with Cinthia's skin at the time of discharge.

Marsh's version of the events is significantly different. Marsh testified that he went to Cinthia'a apartment simply to visit his children, not to harm anyone. He claims that he took the weapon and bullet-proof vest for self-protection because he had previously been threatened over the telephone by an anonymous caller claiming to be his wife's boyfriend, and he believed that the person might be at the apartment. While at the apartment he denies carrying the gun around or pointing it at anyone. Regarding the shooting, Marsh claims that he forced Cinthia to kneel and

he knelt down behind her below the window because he feared police snipers. He testified that Cinthia grabbed the gun, which caused him to lean back and the gun to accidentally discharge.

After the arrest, a piece of paper was found in Marsh's wallet on which Marsh had written the following: "Cindy's boyfriend lives at 395 Dries Street, Saukville, No. 8." At trial, Marsh attempted to introduce the note to support his assertion that he believed Cinthia's boyfriend was at the apartment and that he needed the gun and vest for protection, not for a premeditated killing. Therefore, Marsh argued that the note was directly relevant to his state of mind at the time of the shooting and was integral to his defense that the shooting was accidental. The trial court, however, excluded the note from evidence. On appeal, Marsh argues that the trial court erred as a matter of law by excluding the note from the jury's consideration and that this error substantially prejudiced his defense.

The state argues that even if the evidence was relevant and thus erroneously excluded, the error was harmless when considering all of the evidence. The test for determining whether an error is harmless is whether there is a reasonable possibility that the error contributed to the conviction. *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231–32 (1985). Assuming error, the burden of proving the lack of prejudice in this case is on the state since it is the beneficiary of the error. *Id.* at 543, 370 N.W.2d at 232. We conclude that the state has met its burden and that there is no reasonable possibility that the jury would have decided differently if the note had been admitted.

649

Even if the jury believed Marsh's assertion that he was armed solely for self-protection, the note does not explain why Marsh continued to use and display the gun even *after* he entered the apartment and determined that no threatening boyfriend was present. The note lends no insight into why Marsh was holding the gun to Cinthia's head or whether the gun discharged accidentally, which was the ultimate issue for the jury. There is nothing inconsistent with Marsh believing that there might be a dangerous boyfriend present at Cinthia's apartment and the notion that Marsh went to Cinthia's apartment with the intent of killing her.

Further, despite the exclusion of the note, the trial court allowed Marsh to testify regarding his beliefs and state of mind when entering the apartment. It is highly unlikely that the admission of the note would have made Marsh's testimony more believable or changed the result of the trial, given all of the other evidence suggesting that Marsh anticipated a violent confrontation with Cinthia and the police. For example, Marsh came to the apartment with a gun, bulletproof vest, and army helmet. The children testified that Marsh often appeared angry and acted violently, frequently pointed the gun at Cinthia's head, and threatened to kill her on numerous occasions throughout the ordeal. Marsh subsequently mailed letters to his brother, written months before, which both anticipated his death and suggested a revenge motive against "Cindy and the system" for taking away his boys.

Therefore, based on all of the evidence, we conclude that even if the trial court's refusal to admit the note into evidence was erroneous, Marsh was not prejudiced because there is no reasonable possibility

that the jury would have decided differently had the note been admitted into evidence.

The second issue before this court is the validity of the trial court's sentence. The trial court sentenced Marsh to life imprisonment plus ten years on the first-degree intentional homicide conviction. In his postconviction motion to vacate the sentence, Marsh argued that his first amendment rights were violated by the admission of evidence concerning his religious and political beliefs at his sentencing hearing. The trial court denied Marsh's motion for postconviction relief, which he now appeals.

Marsh argues that his sentencing hearing was tainted by the inclusion of evidence in his presentence report which indicated that he studied Odinism, the white supremacy religion of the Vikings, and possessed other materials relating to the Ku Klux Klan, Nazi Germany, and the National Association for the Advancement of White People. The presentence report also refers to Marsh's potential danger to society as a result of his beliefs and interest in these organizations. Marsh argues that his first amendment rights were violated by the inclusion of such information because it is not relevant to the crime he was convicted of.

Ordinarily, sentencing is left to the discretion of the trial court, and appellate review is limited to determining whether there was an erroneous exercise of discretion. *State v. J.E.B.*, 161 Wis. 2d 655, 661, 469 N.W.2d 192, 195 (Ct. App. 1991), *cert. denied*, 112 S. Ct. 1484 (1992). In reviewing a sentence to determine whether discretion has been misused, we presume that the trial court acted reasonably. *Id.* However, the trial court's sentencing discretion is subject to limitations,

and a sentence may not be based on constitutionally invalid grounds. *Id.* at 663, 469 N.W.2d at 195.

The seminal case regarding the extent to which the first amendment limits the discretion of a sentencing court is *Dawson v. Delaware*, 112 S. Ct. 1093 (1992).[2] In *Dawson*, the state presented evidence linking the defendant to the Aryan Brotherhood, known primarily as a white supremacist prison gang originating in California prisons in the 1960's. The Court held that while evidence of first amendment protected beliefs and associations are not *per se* barred from consideration at sentencing, it was error to admit evidence of a defendant's unpopular political beliefs when those beliefs had no relevance to the crime for which the defendant was being sentenced. *Id.* at 1097–98.

Marsh argues that *Dawson* prohibits consideration of his religious and political beliefs at sentencing because they are unrelated to the crime he was convicted of. The state concedes that some of the information included in Marsh's presentence report offends the holding of *Dawson*. However, the state contends that the information had no effect on sentencing and therefore constitutes harmless error. Marsh argues that the error in this case cannot be subject to harmless error analysis and relies primarily on Justice Blackmun's concurring opinion in *Dawson* for support:

[2] *See also State v. J.E.B.*, 161 Wis. 2d 655, 673, 469 N.W.2d 192, 200 (Ct. App. 1991), *cert. denied*, 112 S. Ct. 1484 (1992) (trial court's consideration of J.E.B.'s pornographic reading materials did not violate J.E.B.'s first amendment rights); *State v. Wickstrom*, 118 Wis. 2d 339, 356–57, 348 N.W.2d 183, 192 (Ct. App. 1984) (defendant's sentence not invalid because trial court had commented upon defendant's beliefs during sentencing). However, both *J.E.B.* and *Wickstrom* were decided prior to *Dawson v. Delaware*, 112 S. Ct. 1093 (1992).

"Because of the potential chilling effect that consideration of First Amendment activity at sentencing might have, there is a substantial argument that harmless-error analysis is not appropriate for the type of error before us today." *Id.* at 1100 (Blackmun, J., concurring).

The United States Supreme Court has previously sanctioned the use of harmless error analysis when errors have occurred in a capital sentencing proceeding. *See Clemons v. Mississippi*, 494 U.S. 738 (1990). The Wisconsin Supreme Court has recognized that harmless error analysis is applicable whether the error is of constitutional proportions or not. *Dyess*, 124 Wis. 2d at 543, 370 N.W.2d at 231–32. Additionally, this court has previously recognized that harmless error analysis is available in reviewing a claim of constitutional error in the sentencing process. *See State v. Littrup*, 164 Wis. 2d 120, 132, 473 N.W.2d 164, 168 (Ct. App. 1991) (after a defendant establishes a due process violation in sentencing process by clear and convincing evidence, the burden of persuasion to establish harmlessness rests with the state). Accordingly, we expressly reject Marsh's argument that a harmless error analysis is not appropriate when reviewing protected first amendment activity improperly introduced during sentencing.

Upon reviewing the record, we conclude that the state has met its harmless error burden. Marsh acknowledges that the trial court made no explicit reference to the challenged material at sentencing. However, Marsh argues that the fact that the court stated that it did not rely on the information is not enough to cure the constitutional defect, and that we

653

should assume that the information unconstitutionally infected the entire sentencing process. We decline to adopt such an assumption, since doing so would preclude any harmless error analysis.

When considering the record in its entirety, it is clear that we need not speculate whether the information affected the trial court's sentence. This is not a case in which the court cursorily concluded that it did not rely on the objectionable information. Rather, the court forcefully asserted its strong belief in protecting first amendment rights in all cases. In describing what effect Marsh's protected first amendment activity had on his sentencing, the court stated:

> [O]ne of the most disturbing social trends that is underway right now . . . is the willingness of a lot of people who ought to know better to suspend the constitution for certain causes deemed appropriate in the interest of political correctness . . . . And I think certainly the targets of those kinds of restrictions . . . have been people who have expressed either the religious or political views that the PSI said Mr. Marsh possessed. I can tell you that I don't hold those views against him one bit even if they are true. If I didn't say it in the sentencing, I'll say it now. I hold the First Amendment rights to be more dear than most of the people that have been addressing the issue in public. And there is only one thing that stood out in my mind at that sentencing than anything else. Quite frankly it was the mental picture that I had of what happened just before the trigger was pulled, not Mr. Marsh's alleged connection to Odinism . . . . The picture that I had in my mind was not somebody in a white sheet but it was somebody with a gun in their hand held up to the back of someone's head.

654

It is evident from such statements that the trial court neither considered nor relied on the objectionable information in determining Marsh's sentence.

Marsh alleges that "[h]e has been sentenced on the basis of a presentence report which contained concededly irrelevant and constitutionally improper information concerning his political and religious beliefs, in violation of his First Amendment rights." He claims that such information was wrongfully included, as *Dawson* recognized, because the fact finder would find those beliefs "morally reprehensible." Based upon the trial court's comments, we are convinced that the only thing the court considered morally reprehensible was Marsh's actions, including terrorizing his family over two days and shooting his wife in the head.

*By the Court.*—Judgment and order affirmed.