**Opinion filed April 26, 2012**



# In The

# Eleventh Court of Appeals

_____

## No. 11-10-00109-CR

_____

## STEPHEN DWAYNE WALLACE, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 217th District Court**
**Angelina County, Texas**
**Trial Court Cause No. 29,052**

## M E M O R A N D U M   O P I N I O N

The jury convicted Stephen Dwayne Wallace,[1] appellant, of the offense of aggravated kidnapping. Appellant pleaded true to the enhancement allegations, and the jury assessed his punishment at confinement for life and a fine of $2,500. We affirm.

### *Issues*

Appellant presents two issues on appeal. In the first issue, appellant challenges the legal sufficiency of the evidence to support his conviction. In his second issue, appellant argues that

---

[1]We note that the indictment reflects appellant's name to be Stephen Dwayne Wallace but that the judgment shows it to be Stephen Wallace.

the trial court abused its discretion during the punishment phase of trial by allowing gang-related evidence.

## *Sufficiency of the Evidence*

Appellant asserts that the evidence is insufficient to show that appellant had the intent to abduct, restrain, injure, or terrorize Julie Robinson. We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or a factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Appellant was charged with and convicted of the offense of aggravated kidnapping under TEX. PENAL CODE ANN. § 20.04 (West 2011) for intentionally or knowingly abducting Julie Robinson, without her consent, with the intent to terrorize her or inflict bodily injury on her. As relevant to this case, "abduct" means to restrain a person with the intent to prevent the person's liberation by secreting or holding the person in a place where she is not likely to be found. *Id.* § 20.01(2)(A). "Restrain" means "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1). Restraint is without consent if it is accomplished by force, intimidation, or deception. *Id.* § 20.01(1)(A). The jury was charged accordingly and was authorized to convict appellant as either a principal or a party to the offense.

The record shows that appellant and Robinson had been in a romantic relationship but that, on June 22, 2009, Robinson had decided to leave appellant. Robinson made arrangements to go stay with her best friend, Jennifer Holliday. Holliday's aunt, Robin Franklin, picked Robinson up and took her to Holliday's house. Before they arrived at Holliday's house, appellant called and talked to both Franklin and Robinson. Robinson testified that appellant sounded really upset and agitated. He was yelling, crying, and saying, "You ain't going to leave me like that." Robinson told appellant that she was not leaving him. When Robinson and Franklin got to Holliday's house, a silver Crown Victoria that appellant had been driving was in

2

Holliday's driveway. Franklin passed the house, and Robinson screamed at Franklin to go back, which she did. Ashley McLemore and Stephanie Powell were sitting in the Crown Victoria. Inside the house were Holliday, her son, her boyfriend, her roommate, Christopher Guffey ("Kidd"),[2] and a man whom Robinson did not know at the time but later learned that his name was Gary Allen ("Lucky"). Shortly after Robinson arrived at Holliday's house, appellant and Rachel Tutt called Holliday's phone. Robinson testified that Tutt was making threats. Robinson described Tutt—who had been appellant's best friend but had become romantically involved with appellant—as "evil." Robinson again talked to appellant on the phone and tried to calm him down. Although she would rather have stayed at Holliday's, she told appellant she was coming; she felt intimidated and was afraid for the safety of Holliday and Holliday's son. She got into the Crown Victoria and left with the group that had come to Holliday's house looking for Robinson.

Franklin testified that, around 9:00 or 10:00 p.m. on June 22, 2009, Robinson called her and asked for a ride to Holliday's house. While Franklin was on her way to meet Robinson, appellant called Franklin. Franklin testified that appellant was looking for Robinson and stated, "I'll be damned if she's going to leave me with just a note." Franklin said that she told appellant to leave Robinson alone and that appellant replied, "You're lying, bitch. I'll kill your ass." Robinson was shaking and crying when she got into Franklin's car. Franklin proceeded to Holliday's house but drove past it because of the commotion going on there. After they passed Holliday's house, Guffey called Robinson. Franklin could hear Guffey threatening, "Get back up here or somebody's going to get hurt." Robinson told Franklin to go back to Holliday's house, saying, "They'll hurt her. They'll hurt her. Just go back. Somebody's going to get hurt." Franklin turned around and went back. When Franklin pulled into Holliday's driveway, Guffey ran up to Franklin's car, yanked open the passenger door, yanked Robinson out of the car by her hair, and threw her to the ground. Guffey then jumped in the car, grabbed and twisted Franklin's arm, and told her she was not leaving until appellant got there. Guffey was trying to grab Franklin's keys. About that time, "Lucky" ran outside and said that he thought Holliday had called the police. "Lucky" grabbed Robinson and put her into the backseat of the Crown Victoria. Guffey's phone rang; it was appellant calling. Franklin could hear appellant screaming

---

[2]We note that, in a separate trial, Guffey was also convicted of the aggravated kidnapping of Robinson and also received a life sentence. We have this same day affirmed Guffey's conviction. *See Guffey v. State*, No. 11-10-00106-CR (Tex. App.—Eastland April 26, 2012, n.p.h.) (mem. op., not designated for publication).

over the phone. Guffey told appellant, "We've got her. We've got her." Appellant replied, "Bring her to me." Guffey asked appellant what to do about the rest of the people at Holliday's house, and appellant said, "Take them out. Take them all out." Guffey got out of Franklin's car and threw Robinson, who had jumped out of the Crown Victoria, back into the Crown Victoria again. They left. Franklin testified that she was terrified, "scared to death," and that she was afraid "they" were coming back to burn the house down with Holliday and her son in it as "they" had threatened to do. Based upon what she observed, Franklin testified that Robinson did not want to leave with Guffey and the others in the Crown Victoria and that she did not "go on her free will." Franklin also testified that appellant was "[m]ad as hell" and "furious" because Robinson had left.

Holliday testified that she got a call from appellant sometime during the evening of June 22, 2009. Appellant was looking for Robinson, and he was "mad and angry." After Holliday's aunt, Franklin, left the house to get Robinson, Holliday heard a "big bang c[o]me through the door." Guffey and a man whom she had never seen before (but heard others call him "Lucky") had "stomped [her] door open." They were there to get Robinson, and they accused Holliday of hiding her. The two men told Holliday and the others at her residence to put their cell phones on the table and not to move. Holliday was "very scared." Guffey was talking on the phone to appellant and Tutt. According to Holliday, Guffey was not acting on his own accord. Holliday heard appellant telling Guffey what to do the whole time he was there. Appellant kept saying, "Get Julie [Robinson], find Julie. She's there." Holliday also heard appellant screaming, "[T]ake 'em out, take 'em out, take 'em out." Guffey said he would not leave without Robinson. When Robinson arrived at the house, Guffey went outside and "put" Robinson into a Crown Victoria. Guffey threatened to burn Holliday's house down with her son in it if she called the police. Guffey and the others who had arrived in the Crown Victoria left and took Robinson with them. Holliday took her son to her grandmother's house, waited on her mother to come get her, and then went to the sheriff's department and reported the incident. Holliday testified that Robinson was scared and did not leave voluntarily but that those people were not going to leave unless Robinson went with them. Holliday testified that she did not associate with appellant or Guffey and that she did not approve of Robinson's association with them. Holliday's roommate testified similarly to Holliday regarding the events that occurred that night and agreed that Robinson seemed to be scared.

4

Robinson testified that, after leaving Holliday's house in the Crown Victoria, they drove around while Guffey was talking on the phone to either appellant or Tutt. One of them told Guffey to put Robinson in the trunk; Robinson believed it was appellant who was giving the order to put her in the trunk. They pulled over, and Guffey and McLemore got out of the car. McLemore rearranged the stuff that was in the trunk. Then Guffey reached in, grabbed Robinson, and put her in the trunk. They drove to a Shell station. At the station, the trunk popped open and appellant was standing there. Appellant said, "Bitch, you got me f----d up. You ain't going to leave me like that." The trunk was shut and then opened again. Tutt was standing there; she grabbed Robinson's hair, said something, and then the trunk was shut again. They left the station but stopped a short distance away. When they stopped this time, appellant yanked Robinson out of the trunk by the back of her head and her pants, threw Robinson down on the road, kicked her into the ditch, picked her up, and put her in the backseat of the little red car that appellant was driving. They drove for a while with appellant driving and Tutt in the passenger seat. Appellant kept yelling at Robinson and asking her questions. At one point, he reached back to hit Robinson but could not really hit her because he was driving. Tutt took over as the driver, and appellant got in the backseat with Robinson. Appellant got more and more upset and "just kept hitting" Robinson. Tutt was provoking things. Robinson pleaded with appellant and told him that she loved him, but appellant's demeanor did not change.

Appellant told Tutt to drive to the cemetery. The Crown Victoria had followed them there. Both cars pulled into the cemetery and stopped, and everybody except for Powell got out. Appellant continued hitting her after they got out of the car. He knocked her to the ground several times. As a result of the beating from appellant, Robinson had a busted left eardrum, some blood on the brain, a broken tooth, a missing tooth, some bald spots on her head, scratches, and bruises. The beating was interrupted when somebody saw car lights. Robinson kept losing consciousness. She next remembered being in the red car with appellant, Tutt, and Guffey. They drove around for a while and eventually went to Tutt's parents' house. While there, appellant and Robinson talked some more. Appellant ultimately decided that Robinson had set him up, and he told her that they "were going to have to kill" her. Tutt, appellant, and Robinson left in the red car. Robinson was afraid; appellant had told her that Tutt was going to kill her. Instead, they drove around, talked some more, and returned to Tutt's parents' house. Robinson fell asleep.

Guffey woke Robinson up, handed her the phone, and told her that somebody from the sheriff's department wanted to talk to her.  It was Deputy Donna Clayton calling to check on Robinson.  Both Robinson and appellant talked to Deputy Clayton.  They told Deputy Clayton that Robinson was okay and that she would come to the department to prove that she was okay.  There were several phone calls back and forth between Deputy Clayton and appellant and Robinson.  During one of the phone conversations between Robinson and Deputy Clayton, Robinson was being asked "yes or no" questions and was able to inform Deputy Clayton that she was hurt.  Tutt's mother refused to take Robinson to the sheriff's department.

They left Tutt's parents' house.  Powell, Tutt, and appellant left in the red car.  Guffey, "Lucky," McLemore, and Robinson left in the Crown Victoria.  Guffey drove the Crown Victoria, following the red car at that point.  They were not headed in the direction of the sheriff's department.  While they were driving, a police car began following them with its siren and lights turned on.  Guffey sped up.  He also slammed on the brakes a couple of times.  At some point, Guffey "sort of pulled over."  Everybody jumped out of the Crown Victoria, and everyone except for Robinson took off running.  Robinson requested to be taken into custody and put in a police car.

Based upon Holliday's report and Deputy Clayton's phone conversations, law enforcement officers were dispatched to look for the Crown Victoria.  Detective Tom Matthews spotted the Crown Victoria and the red car.  The cars were not headed toward the sheriff's department when they were intercepted; instead, they were traveling in the opposite direction.  Guffey was driving the Crown Victoria, and Robinson was in the backseat.  Detective Matthews turned on his lights and siren and attempted to stop the Crown Victoria, but Guffey sped up and, at one point, slammed on his brakes and then sped back up.  After a five-mile pursuit, Guffey stopped.  All of the people in the Crown Victoria, except for Robinson, fled.  Lieutenant Bryan Holley of the sheriff's department arrived at the scene about ten or fifteen seconds behind Detective Matthews.  Robinson asked Lieutenant Holley to handcuff her and put her into the police car where she would be safe.  Lieutenant Holley obliged and then transferred custody of Robinson to Deputy Clayton when she arrived.  Shortly thereafter, Lieutenant Holley spotted the red car nearby.  He saw a female driving and a female in the backseat and noticed that the front passenger seat was laid back.  Then, he observed "a silhouette of a male" raise up to see what was going on.  Lieutenant Holley turned on his lights and siren and stopped the red car.

Appellant, who had been in the front passenger seat, fled into the woods. Appellant was arrested about two hours later.

When Deputy Clayton arrived at the scene, Robinson was almost hysterical. Robinson said that she had been kidnapped and was in fear for her life, and she asked Deputy Clayton to please keep her and her children safe. Robinson showed visible signs of physical abuse. Deputy Clayton took pictures of Robinson's injuries. At trial, Deputy Clayton described the injuries (as did Robinson), and numerous pictures showing the injuries were admitted into evidence.

Appellant urges that the evidence is insufficient to support his conviction because the evidence failed to show that appellant had the intent to injure Robinson, because the evidence showed that Robinson voluntarily got into the car and into the trunk, because the credibility of some of the witnesses was questionable, and because there were inconsistencies in the evidence. First, after reviewing all of the evidence, we cannot hold that the evidence is insufficient based upon the relatively minor inconsistencies to which appellant refers in his brief or upon any witness's credibility or lack thereof. The jury, as the trier of fact, was the sole judge of the credibility of the witnesses and of the weight to be given to their testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007), art. 38.04 (West 1979). As such, the jury was free to believe or disbelieve all or any part of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Next, with respect to appellant's contention that Robinson went with him voluntarily, we conclude that there is more than ample evidence from which a rational jury could have determined beyond a reasonable doubt that Robinson did not voluntarily go with appellant or Guffey, that Robinson's restraint was accomplished by force or intimidation, and that Robinson was abducted. Finally, from the evidence presented at trial, the jury could have determined beyond a reasonable doubt that appellant had the intent to inflict bodily injury or to terrorize Robinson or that appellant acted as a party to the offense. We hold that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and that the evidence is sufficient to support appellant's conviction. Appellant's first issue is overruled.

*Gang-Related Punishment Evidence*

Appellant urges in his second issue that the trial court abused its discretion in admitting gang-related evidence during the punishment phase of trial. The record shows that Deputy

7

Clayton testified, without objection, regarding the Aryan Brotherhood of Texas and appellant's affiliation with that group. She testified that that organization is a Texas prison gang that was originally organized to protect its members while in prison but that the organization is involved in various criminal activities outside of prison to support each other, such as drug trafficking, theft, and burglary. Photos of appellant's numerous, Aryan-Brotherhood-related tattoos were admitted into evidence. Deputy Clayton testified that appellant claimed to be a captain in the Aryan Brotherhood of Texas.

The State asserts that appellant failed to preserve this issue. We agree. Appellant made no objection at trial to the admission of the photos or to Deputy Clayton's testimony. Consequently, he failed to preserve his contention for review. TEX. R. APP. P. 33.1; *Dinkins v. State*, 894 S.W.2d 330, 354–55 (Tex. Crim. App. 1995). Moreover, the evidence showed that appellant was a member of the Aryan Brotherhood of Texas and that the Aryan Brotherhood of Texas was involved in criminal activities. Consequently, the trial court did not abuse its discretion in admitting the evidence. *See Mason v. State*, 905 S.W.2d 570, 576–77 (Tex. Crim. App. 1995); *Beasley v. State*, 902 S.W.2d 452 (Tex. Crim. App. 1995); *see also Dawson v. Delaware*, 503 U.S. 159, 165–68 (1992). Appellant's second issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


April 26, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.

8