

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-07-287-CR
NO. 2-07-288-CR
NO. 2-07-289-CR

JAMES MICHAEL DEAN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

------------

FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant James Michael Dean appeals four forty-five-year sentences imposed by a jury following his guilty pleas and convictions for four counts of aggravated robbery. In his sole point, appellant contends that the trial court erred by admitting unduly prejudicial punishment evidence against him. *See* Tex. R. Evid. 403. We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

**Background Facts**

Near midnight on October 25, 2006, appellant and another individual went to Moe's Short Stop, a Hurst convenience store. When appellant arrived, store employee Rajesh Bajracharya was outside loading a truck. Appellant charged at Rajesh with a knife, knocked him down, and held the knife about four inches from Rajesh's face as appellant's partner entered the store and took some money. After appellant's partner left the store, he and appellant searched Rajesh's pockets and appellant took Rajesh's wrist watch. Four days later, appellant and his partner went to another convenience store in Bedford, Texas, where they robbed Chhitis Bhattachani.[2]

On the evening of November 2, 2006, appellant returned to Moe's Short Stop, wearing black clothing, gloves, and sunglasses. He walked behind the counter and pointed a knife at Nikesh Shrestha, who was helping a friend run the store. While doing so, appellant commanded Nikesh to "get down, bitch, or else I am going to stab you." While appellant continued to point the knife at Nikesh, his partner took money from the store's register. During the robbery, appellant also stole Nikesh's backpack, his cell phone, and some of his cash.

---

[2] Because Chhitis did not testify, specific details regarding this incident are absent from the record.

Three days later, appellant went to the Quick Track convenience store in Bedford, again wearing black clothing, gloves, and sunglasses. While holding a knife, appellant quickly walked around the counter and ordered store clerk Santosh Gyawali to kneel. After Santosh complied with appellant's command, appellant took Santosh's money, his wallet, and his cell phone, as well as some of the store's cigarettes before leaving. The Hurst and Bedford police departments conducted a joint investigation and determined that appellant participated in each of the incidents. They charged appellant with four counts of aggravated robbery.[3] At trial, after the parties conducted voir dire and the State read appellant's indictments, appellant pled guilty to each of the four charges. In exchange for appellant's guilty pleas, the State waived the habitual offender enhancement paragraphs contained in the indictments, rendering

---

[3] The four robbery charges were indicted in three separate cases and each indictment contained a habitual offender enhancement paragraph. However, the cases were tried concurrently.

3

appellant's range of punishment at five to 99 years or life.[4]  *See* Tex. Penal

Code Ann. §§ 12.32(a), 29.03(b) (Vernon 2003).

Before testimony began on the issue of punishment, appellant's counsel

alerted the trial court that the State planned to introduce photographs of

appellant's tattoos, which connected appellant to racist organizations and

beliefs.  Appellant's counsel argued that the photographs were inadmissible

because they were "not relevant to the proceeding" and they were "overly

inflammatory and prejudicial and not necessary to the conduct of the case or

to anything the State [was] required to prove."  The State responded by

contending that the photographs demonstrated appellant's negative character

traits and his affiliation with a prison organization that was associated with

criminal activities.  The trial court deferred its ruling on the photographs until

they were actually offered in evidence.

---

[4] Because the waiver of the enhancement paragraphs affected only the minimum amount of punishment appellant could have received, rather than capping the maximum amount, no "plea bargain" occurred for the purposes of Rule 25.2(a)(2) of the rules of appellate procedure. Tex. R. App. P. 25.2(a)(2); *see Taplin v. State*, 78 S.W.3d 459, 461 (Tex. App.—Austin 2001, no pet.); *Perez v. State*, 129 S.W.3d 282, 286 (Tex. App.—Corpus Christi 2004, no pet.) (noting that "[o]nly a plea bargain that incorporates an agreed recommendation as to punishment and is accepted by the court" triggers jurisdictional restrictions under Rule 25.2(a)(2)).

During appellant's trial on punishment, Hurst Police Detective Chad Woodside (who had previously served on a gang task force) testified about white supremacist gang activity. Specifically, Detective Woodside testified that he was familiar with the Ku Klux Klan (KKK), that the KKK was "usually involved in crime," including violent crime, and that the KKK's typical targets were minorities or individuals from other countries. Detective Woodside also testified about an organization called the White Knights, which he explained was an offshoot of the KKK. He testified that the White Knights also engaged in violent criminal activity.[5]

Detective Woodside then stated that both of these groups associate themselves with particular symbols, such as swastikas, and also associate themselves with specific historical figures, such as Adolf Hitler. He related that members of these groups commit violent activities while incarcerated.

During a voir dire examination while the jury was excused, the State then questioned Detective Woodside about photographs of appellant's tattoos, which

---

[5] Over an objection by appellant's counsel, the trial court admitted a completed Tarrant County jail classification form (based on answers given by appellant during the book-in process) which indicated that appellant was a member of the White Knights and that appellant had problems with "blacks and Mexicans." Testimony indicated that the White Knights are a gang that was formed in the Texas prison system. The classification form also indicated that appellant was a daily user of methamphetamine and that he had previously served time in prison.

depicted, among other images, a swastika and the faces of Adolf Hitler, George Rockwell (the founder of the American Nazi Party), and Reinhard Heydrich (one of the architects of the Holocaust and the man considered by Hitler to be his successor). Detective Woodside admitted that while the tattoos indicated that appellant had negative character traits, they did not specifically identify appellant as a member of a particular white supremacist group, and a person could have such tattoos without belonging to any particular group. Detective Woodside also conceded that he was not an expert on the philosophical principles of white supremacist groups and their connection with criminal activity.

After the conclusion of the voir dire examination, appellant's counsel argued that the photographs were an avenue of political expression, that they were insufficient to establish appellant's link to any particular criminal organization, and that there was no evidence that appellant's robberies were racially motivated. Appellant's counsel therefore contended that admission of the photographs would punish appellant for exercising his constitutional rights and would unduly prejudice him.[6] The State responded by asserting that the

_____

[6] Despite arguing that the photographs should be excluded, Appellant's counsel stipulated to the admissibility of some white supremacist literature appellant had possessed. Appellant's counsel also stipulated to the admissibility of "pen packs" which established that appellant had previously

6

photographs related to appellant's general reputation and his character and were therefore admissible in the punishment phase of a trial. After hearing these arguments, the trial court overruled appellant's objection to the photographs and granted appellant a running objection to all evidence relating to the tattoos.[7]

In its closing argument, the State contended that appellant should have received a life sentence because, in part, his tattoos demonstrated that he had a hateful, malicious character. In response, appellant's counsel asserted that appellant had joined the White Knights in prison as an avenue of survival, that there was no evidence that the crimes he had pled guilty to were racially motivated, and that appellant had exercised his constitutional rights in maintaining his white supremacist beliefs. After deliberating, the jury convicted appellant of each of the four robbery charges (as instructed by the trial court pursuant to appellant's guilty pleas), and then sentenced him to forty-five years' confinement on each charge.

---

been convicted of six various felony offenses.

[7] Several other photographs were later admitted in evidence which further depicted appellant's tattoos. For instance, one of these photographs demonstrated that "White Knights" was tattooed on appellant's left forearm, and another exhibited a burning cross and three hooded KKK Klansmen, with one of the Klansmen holding a noose and another holding a shotgun.

**Admission of Tattoo Photographs**

In his sole point, appellant asserts that his sentences should be reversed because the trial court erred in its decision to admit the photographs of his tattoos.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005); *Stevens v. State,* 234 S.W.3d 748, 786 (Tex. App.—Fort Worth 2007, no pet.). Under this standard, if "the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made," then we must uphold the trial court's decision. *Martin*, 173 S.W.3d at 467. The trial court's ruling must stand as long as it was "at least within the zone of reasonable disagreement." *Id.*

The trial court's evidentiary decision must be reasonable in light of all relevant facts. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). However, the "mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003).

Further, even if erroneous, the admission or exclusion of evidence is a non-constitutional error governed by rule 44.2(b) of the Texas Rules of

8

Appellate Procedure if the trial court's ruling merely offends the rules of evidence. *See* Tex. R. App. P. 44.2(b); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Matz v. State*, 21 S.W.3d 911, 912 (Tex. App.—Fort Worth 2000, pet. ref'd) (op. on remand).[8]  Therefore, the error must be ignored unless it had "a substantial, injurious effect or influence on the jury's verdict." *See King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *Matz*, 21 S.W.3d at 912.  In other words, we must uphold the trial court's judgment if we have a "fair assurance that the error did not influence the jury, or had but a slight effect." *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  Also, improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence. *Reyes v. State*, 84 S.W.3d 633, 638 (Tex. Crim. App. 2002); *Matz*, 21 S.W.3d at 912 (holding that the trial court's admission of videotaped testimony was not a reversible error where live testimony established the same facts).

When a defendant pleads guilty before a jury, the proceeding becomes a unitary trial where the state may introduce evidence allowing the jury to intelligently exercise discretion in the assessment of punishment. *Carroll v.*

---

[8]  Rule 44.2(b) states that any error in a criminal case other than constitutional error that "does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b).

*State*, 975 S.W.2d 630, 631–32 (Tex. Crim. App. 1998). Evidence of the defendant's criminal record, his character, and his reputation is admissible. *See Basaldua v. State*, 481 S.W.2d 851, 854 (Tex. Crim. App. 1972); *see also Fuller v. State*, 253 S.W.3d 220, 227 (Tex. Crim. App. 2008), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. July 24, 2008) (No. 08-6624) (explaining that when a "defendant pleads guilty to a jury, the jury need not return any verdict of guilty," and that the case "simply proceeds with a unitary punishment hearing").

Evidence is relevant to punishment where it is "helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Rodriguez v. State*, 203 S.W.3d 837, 842 (Tex. Crim. App. 2006). The evidence that may be admitted in punishment "is a function of policy rather than a question of logical relevance," because "[d]eciding what punishment to assess is a normative process, not intrinsically factbound." *Sunbury v. State*, 88 S.W.3d 229, 233–34 (Tex. Crim. App. 2002) (adding that one of the policy goals is to provide "complete information for the jury to tailor an appropriate sentence").

Appellant argues that the admission of the photographs depicting his tattoos improperly directed the jurors to consider his ethnicity, wrongly focused on his membership in a gang as a sentencing factor, punished him for exercising

his First Amendment rights, and unduly prejudiced him by inflaming the jury. He therefore contends that the photographs should have been excluded. In support of his argument that the jury was improperly directed to consider his ethnicity, appellant cites section 3(a)(2) of article 37.07 of the Texas Code of Criminal Procedure. Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(2) (Vernon Supp. 2008). That provision states that "evidence may not be offered by the state to establish that the race or ethnicity of the defendant makes it likely that the defendant will engage in future criminal conduct." *Id*.

However, the record in this case does not indicate that the photographs of appellant's tattoos were offered to establish that appellant would engage in future criminal conduct merely because he was white. Instead, at the time the photographs were offered and during closing argument, the State contended that the photographs established that appellant was connected with criminally violent groups, that because of this connection he could engage in future criminal activities, and that the tattoos reflected negatively on appellant's general reputation and character. Because the photographs did not focus on appellant's race but on his negative character as demonstrated by his beliefs and associations, no violation of section 3(a)(2) occurred. *Id*.; *see also Hicks v. State*, Nos. 05-04-01664-CR, 05-04-01665-CR, 05-04-01666-CR, 05-04-01667-CR, and 05-04-01668-CR, 2005 WL 3540844, at *3 (Tex.

App.—Dallas Dec. 28, 2005, no pet.) (not designated for publication) (upholding the trial court's admission of photographs depicting white supremacist tattoos because they were offered "as evidence of appellant's selfishness, and his impact on the victims, not as evidence to establish that his race would make him more likely to engage in future criminal conduct").

Next, appellant asserts that the admission of the photographs wrongfully focused on his membership in white supremacist gangs as a sentencing factor, relying on *Beasley v. State*, 902 S.W.2d 452, 455–57 (Tex. Crim. App. 1995). In *Beasley*, the Texas Court of Criminal Appeals held that where evidence indicates that a gang engages in criminal activities and has a negative reputation in the community, then evidence that a defendant is a member of the gang is admissible at punishment because it relates to the defendant's character. *Id*. at 456. Specifically, the court held that such evidence is admissible as long as the jury is (1) provided with evidence of the defendant's gang membership, (2) provided with evidence of the character and reputation of the gang, (3) not required to determine if the defendant committed the bad acts or misconduct, and (4) only asked to consider the reputation or character of the accused. *Id*. at 457.

Here, the jury was provided evidence of appellant's membership in the White Knights through one of his tattoos which said "White Knights," through

12

other tattoos commonly associated with the White Knights, and through a jail classification form which indicated his membership. Testimony (by two former gang task force officers) established that the White Knights organization is a prison gang that engages in violent criminal activity against racial minorities. As we have noted, the State submitted the photographs for the purpose of relating appellant's affiliation with the White Knights to his alleged hateful character, rather than demonstrating that appellant had participated in a particular act attributed to the gang. For these reasons, the trial court properly admitted evidence of appellant's membership in the White Knights. *See id.*; *Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim App. 1996), *cert. denied*, 522 U.S. 832 (1997) (noting that evidence of gang membership is "relevant to show the character of the defendant"); *Stevenson v. State*, 963 S.W.2d 801, 803 (Tex. App.—Fort Worth 1998, pet. ref'd) (per curiam).

Appellant further argues that admission of the photographs violated his First Amendment right to not have his associations and expressions admitted against him at sentencing. For this contention, he cites *Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093 (1992). In *Dawson*, a defendant convicted of capital murder contended that he had a constitutional right forbidding consideration in his sentencing of any evidence concerning beliefs or activities that were protected by the First Amendment. *Id*. at 164; 112 S. Ct. at 1097.

13

Specifically, Dawson contended that evidence showing he was a member of the Aryan Brotherhood was inadmissible. *Id*. at 163, 112 S. Ct. at 1096. The Supreme Court concluded that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id*. at 165; 112 S. Ct. at 1097. However, because there was no evidence submitted that the Aryan Brotherhood was a gang that was associated with criminal activity, or that Dawson's membership in the Aryan Brotherhood was related to the murder, Dawson's membership in the Aryan Brotherhood was "totally without relevance" to his sentencing proceeding, and the Supreme Court therefore ruled that such evidence should have been excluded. *Id*. at 165; 112 S. Ct. at 1097. In contrast, the Supreme Court noted that in other cases where evidence of such facts does exist,

> associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future.

*Id*. at 166; 112 S. Ct. at 1098.

Unlike *Dawson*, in this case evidence was presented that the White Knights (as well as the KKK, as also portrayed by appellant's tattoos) are associated with violent criminal activity and other acts of misconduct in the

14

prison setting. For example, Hurst Police Detective Chad Woodside testified that members of the White Knights or KKK "may do a crime just to get in the group, or to prove their status in the group" and that such members are "prone to be involved in violence and criminal activity." With this type of testimony as a background to apply to appellant's connection with these groups, we conclude that appellant's First Amendment rights were not violated. *See also Anderson v. State*, 901 S.W.2d 946, 954 (Tex. Crim. App. 1995) (concluding that "[a]dmission of evidence of membership in a gang whose primary purpose is illegal activity is not barred by the First Amendment as interpreted by the Supreme Court in *Dawson*"); *Garcia v. State*, 239 S.W.3d 862, 867 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd), *cert. denied*, No. 08-6150, 2008 WL 4107187 (2008) (citing *Dawson* and upholding the trial court's admission of evidence related to the defendant's gang membership).

Finally, appellant contends that the admission of the photographs violated Rule 403 of the Texas Rules of Evidence because they were unfairly prejudicial. *See* Tex. R. Evid. 403. Specifically, appellant argues that the photographs created an undue tendency to suggest a decision on an improper basis and that they compromised the fairness of the trial.[9]

---

[9] The title of appellant's point on appeal also alleges a violation of Rule 401. Tex. R. Evid. 401. However, appellant admits in the body of his

15

Under Rule 403, otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403; *see Sanders v. State*, 255 S.W.3d 754, 760 (Tex. App.—Fort Worth 2008, pet. ref'd) (explaining that unfair prejudice "arises from evidence that has an undue tendency to suggest that a decision be made on an improper basis, commonly an emotional one"); *Woodward v. State*, 170 S.W.3d 726, 729 (Tex. App.— Waco 2005, pet. ref'd) (noting that "unfair prejudice" does not exist where the evidence merely "injures the opponent's case"). In applying Rule 403, the admission of photographs is "within the sound discretion of the trial court." *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002) (adding that Rule 403 "favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial").

Therefore, under Rule 403, we reverse a trial court's decision to admit evidence rarely and only after a clear abuse of discretion. *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). Factors considered in our analysis of a issue regarding Rule 403 are (1) the probative value of the evidence; (2)

---

argument that the photographs were relevant to appellant's punishment. For these reasons, we will limit our analysis as to whether the photographs were unfairly prejudicial under Rule 403. Tex. R. Evid. 403.

16

the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *See Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).

The choice of tattoos may reflect a defendant's beliefs that make him prone to future dangerousness. *See Conner v. State*, 67 S.W.3d 192, 201 (Tex. Crim. App. 2001); *Woodward*, 170 S.W.3d at 729 (explaining that "[a]t the punishment phase of a criminal trial, evidence may be presented as to any matter that the court deems relevant to sentencing, including evidence of the defendant's background or character," and a "defendant's choice of tattoos, like his personal drawings, can reflect his character"); *Hicks*, 2005 WL 3540844 at *3.

As we have described, appellant's tattoos in this case linked him to groups which (as established by testimony) have criminal connections. For this reason, we conclude that the photographs depicting the tattoos were probative of defendant's character for continuing to engage in criminal activities.[10] When considered against testimony later offered by appellant's relatives regarding appellant's capability for rehabilitation, the State's need for this type of

---

[10] The State also contends that appellant's prejudices, as indicated by his tattoos, contributed to his commission of the burglaries. However, there is no evidence in the record which signals that the robberies were racially motivated.

evidence becomes clear. For instance, appellant's cousin, Rick Sanders, testified that he believed appellant should be minimally punished because he felt that appellant did not "want to live this lifestyle," that appellant had a "passion for . . . being a responsible citizen," and that appellant would not "be a threat to society" if he had an adequate support group. Rita Crouch, appellant's aunt, added that appellant is a "very, very loving person, very sweet-hearted," and that he "wants deep down to try to do the right thing." These concepts differ significantly with the ideas portrayed by tattoos of Adolf Hitler and Klansmen with shotguns and nooses, among other images.

Further, there is nothing in the record suggesting that the photographs caused the jury to behave irrationally in sentencing appellant. Instead, beyond the evidence regarding appellant's tattoos and affiliations, the jury was also provided with evidence substantiating appellant's six previous felony convictions and relating the fear of appellant's victims during his robberies.[11] Also, by sentencing appellant to forty-five years' confinement, the jury decided to assess punishment at the middle of the possible range of five to 99 years or life, which applied to the four robberies. *See* Tex. Penal Code Ann. §§

---

[11] A jury note submitted to the court during deliberations indicates that the jury reviewed appellant's prior convictions before making its sentencing decision.

12.32(a), 29.03(b).  Finally, while a moderate amount of time was needed to develop testimony regarding appellant's tattoos and what they portrayed, much of the testimony and the majority of the exhibits submitted to the jury concerned other matters.

For these reasons, we cannot conclude that the trial court abused its discretion by applying the presumption of admissibility under Rule 403 and admitting the photographs.  *See* Tex. R. Evid. 403 (stating that to be excluded, the probative value of evidence must be substantially outweighed by the danger of unfair prejudice); *Hayes*, 85 S.W.3d at 815; *Mozon*, 991 S.W.2d at 846–47.

Moreover, even if the trial court had erred in its decision to admit the photographs of appellant's tattoos, appellant stipulated to the admissibility of over a hundred pages of documentary evidence indicating the same racial and religious prejudices displayed by the tattoos.  The documents included several copies of essays, articles, and jokes extolling the "White Race" and demeaning other people groups.  For example, the literature contained an essay titled "Death of the White Race" which stated that "Hitler was a kindly Uncle, provoked into action by Jewish wickedness."  Also contained in the exhibit was a series of jokes with a printout of a "Federal Nigger Hunting License."  With these documents admitted by stipulation, we cannot agree with appellant that the jury was improperly induced "by the highly prejudicial and inflammatory"

19

tattoo evidence as appellant argues in his brief.  *See Reyes*, 84 S.W.3d at 638 (explaining that a "defendant who allows evidence to be introduced from one source without objection forfeits any subsequent complaints about the introduction of the same evidence from another source").

For these reasons, we hold that the trial court did not abuse its discretion in admitting evidence of appellant's tattoos.  Therefore, we overrule appellant's sole issue.

## Conclusion

Having overruled appellant's only issue, we affirm the trial court's judgment.


PER CURIAM


PANEL:  LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: November 6, 2008

20