**Opinion filed April 26, 2012**



# In The

# Eleventh Court of Appeals

_____

### No. 11-10-00106-CR

_____

## CHRISTOPHER GUFFEY, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 217th District Court**

**Angelina County, Texas**

**Trial Court Cause No. 29,053**

## MEMORANDUM OPINION

The jury convicted Christopher Guffey, appellant, of the offense of aggravated kidnapping. Appellant pleaded true to an enhancement allegation, and the trial court assessed his punishment at confinement for life. We affirm.

### *Issues*

Appellant presents six points of error on appeal. In the first and third points, appellant complains of the admission of evidence that he was a member of the Aryan Brotherhood and the admission of hearsay. In his second and fourth points, appellant asserts that the trial court

erroneously omitted his requested instruction on duress from the jury charge and erroneously included the law of parties in the application paragraph. In his fifth and sixth points, appellant challenges the legal and factual sufficiency of the evidence.

*Sufficiency of the Evidence*

Because appellant's fifth and sixth points of error challenge the sufficiency of the evidence, we will address them first. We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or a factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The elements of the offense are to be defined by the hypothetically correct jury charge for each particular case. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011), *cert. denied*, 80 U.S.L.W. 3462 (U.S. Mar. 19, 2012); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

Appellant was charged with and convicted of the offense of aggravated kidnapping under TEX. PENAL CODE ANN. § 20.04 (West 2011) for intentionally or knowingly abducting Julie Robinson, without her consent, with the intent to terrorize her or inflict bodily injury on her. As relevant to this case, "abduct" means to restrain a person with the intent to prevent the person's liberation by secreting or holding the person in a place where she is not likely to be found. *Id.* § 20.01(2)(A). "Restrain" means "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1). The jury was charged accordingly and was authorized to convict appellant as either a principal or a party to the offense.

The record shows that appellant, at the behest of Stephen Wallace,[1] went to Jennifer Holliday's house looking for Robinson on the night of June 22, 2009. Holliday testified that, she heard a "huge bang," which was the sound of her door being kicked in completely. Appellant

---

[1]We note that, in a separate trial, Wallace was also convicted of the aggravated kidnapping of Robinson and also received a life sentence. We have this same day affirmed Wallace's conviction. *See Wallace v. State*, No. 11-10-00109-CR (Tex. App.—Eastland Apr. 26, 2012, n.p.h.) (mem. op., not designated for publication).

2

and a man whom she did not know (but heard others call him "Lucky") were standing inside her house. They were hollering and demanding to know the whereabouts of Robinson, who had just ended a romantic relationship with Wallace. Appellant told Holliday and the others at her residence to put their cell phones on the counter and not to move. Appellant also threatened to burn Holliday's house down with her son in it if Holliday called the police. Appellant said he would not leave without Robinson. Holliday testified that appellant was on the phone "taking orders" from Wallace and that she heard Wallace say: "Take them out." When Robinson arrived at the house, appellant went outside and "put" Robinson into an older-style Crown Victoria. The other two adult occupants of Holliday's house testified similarly to Holliday and agreed that Robinson did not appear to be going with appellant voluntarily. After taking her son to her grandmother's house, Holliday went to the sheriff's department and reported the incident.

Holliday's aunt, Robin Franklin, gave Robinson a ride to Holliday's house that night. Franklin testified that, just before she met Robinson, Wallace called Franklin. Franklin testified that Wallace was looking for Robinson and stated, "I'll be damned if that ho leaves me with a -- just a note." Franklin also testified that Wallace threatened to kill her when she told Wallace to leave Robinson alone. Robinson was crying and shaking when she got into Franklin's car. Franklin proceeded to Holliday's house but drove past it because of the commotion there. After they passed Holliday's house, appellant called Robinson. Franklin could hear appellant screaming, "You better get back up here to [Holliday's] or somebody's going to get hurt." Robinson began screaming for Franklin to go back to Holliday's house and saying, "They'll hurt her." Franklin turned around and went back. When they pulled into Holliday's driveway, appellant ran up to the car, opened the door, and yanked Robinson out of the car by her hair. Appellant then twisted Franklin's arm, told her to let go of her keys and give him her cell phone, and said that she could not leave. Appellant then called Wallace and said, "We have her. . . . We'll bring her to you." Appellant asked Wallace what to do about the rest of them, and Wallace screamed, "Take the hos out. Take them all out." Appellant then told Franklin that he was going to burn the house down with Holliday and her son in it. About that time, "Lucky" ran outside and informed appellant that he thought Holliday had called the police. Appellant then got out of Franklin's car, grabbed Robinson, and threw her into the backseat of the Crown Victoria. Appellant, his cohorts, and Robinson left in the Crown Victoria. Franklin testified that appellant appeared to be under the influence of methamphetamine or speed.

Robinson testified that, on June 22, 2009, she attempted to leave Wallace, with whom she had been in a romantic relationship. She made arrangements to go to Holliday's house. Robinson feared that Wallace would be looking for her because he had been using lots of drugs and was not thinking clearly. While she was in the car with Franklin and also after she arrived at Holliday's house, Robinson talked to Wallace on the phone and tried to calm him down, but she could hear Rachel Tutt (who was also in an intimate relationship with Wallace) in the background provoking things. Robinson testified that, after Franklin passed Holliday's house, Robinson screamed at Franklin to turn around and take her back to Holliday's house. The scene at Holliday's house was chaotic. Wallace and Tutt were screaming over the phone and instructing appellant and "Lucky" to "take everybody out" and "burn the house down." Robinson testified that, although she would have preferred to stay at Holliday's house, she got in the Crown Victoria and left with appellant because she wanted Holliday and her son to be safe.

In the car were appellant, Robinson, Ashley McLemore, Stephanie Powell, and a man whom Robinson did not know at the time but later came to learn that he was Gary Allen a/k/a "Lucky." At some point after they left Holliday's house, appellant was talking on the phone, presumably with Wallace. Robinson heard appellant ask, "You want her in the trunk?" They pulled over, and appellant and McLemore got out of the car. McLemore moved some of the things that were in the trunk. Appellant then stuck his head in the car and told Robinson, "You got three seconds to get in the trunk or else I'll put you there." After appellant reached in to grab her, Robinson got out of the backseat and got into the trunk. Appellant closed the trunk, and they left. Robinson "was panicking." When the car stopped again, they were at a Shell station. The trunk opened, and Wallace was standing there. Wallace told Robinson that she was not going to leave him like that, and then he shut the trunk. The trunk opened again, and Tutt said, "Bitch, you done f----d up." The trunk closed again, and they left the Shell station and drove a short distance before stopping again. Wallace opened the trunk, pulled Robinson out of the trunk, and threw her into the backseat of the small, red car that Wallace was driving. Wallace and Tutt yelled at Robinson, and Wallace hit her. The Crown Victoria followed the red car, and both cars eventually pulled into a cemetery and stopped. When they arrived at the cemetery, it was the middle of the night. Everyone got out of the cars except for Powell. At the cemetery, Wallace and Tutt beat Robinson to the point that Robinson lost consciousness. The beating was interrupted when somebody saw car lights coming down the road. They all left the cemetery.

4

Robinson, Tutt, Wallace, and appellant left in the red car. They drove around and eventually went to Tutt's parents' house. Although Robinson tried to calm Wallace, Wallace was still acting irrationally and ultimately decided that Robinson had set him up and that Tutt was going to have to kill Robinson.

Robinson tried to stay awake but could not; her head "hurt bad." Later that morning, appellant woke Robinson up and told her that somebody from the sheriff's department was on the phone for her. Appellant handed the phone to Robinson. Deputy Donna Clayton was calling to check on Robinson based upon Holliday's report indicating that Robinson was missing and was probably in danger. Deputy Clayton asked Robinson if she was okay and told Robinson that she needed to see Robinson to make sure. There were various calls back and forth between Deputy Clayton and both Robinson and Wallace. During one of the phone conversations between Robinson and Deputy Clayton, Robinson was being asked "yes or no" questions and was able to inform Deputy Clayton that she was hurt. Wallace decided that they needed to get in the cars and leave Tutt's parents' house, which they did.

Based upon Holliday's report and Deputy Clayton's phone conversations, law enforcement officers were dispatched. Detective Thomas Matthews spotted the Crown Victoria, which was being followed by the red car. The cars were not headed toward the sheriff's department when they were intercepted; instead, they were traveling in the opposite direction. Appellant was driving the Crown Victoria, and Robinson was in the backseat. Detective Matthews turned on his lights and siren and attempted to stop the Crown Victoria, but appellant sped up. After a five-mile pursuit, appellant stopped abruptly. All of the people in the Crown Victoria, except for Robinson, fled. Robinson stated that she had been kidnapped and asked to be taken into custody and put into the police car where she could not be seen. Shortly thereafter, the red car was stopped nearby by another officer, and Wallace fled.

When Deputy Clayton arrived at the scene, Robinson was crying and terrified and showed visible signs of physical abuse. Deputy Clayton took pictures of Robinson's injuries. Both Robinson and Deputy Clayton described the injuries at trial. Robinson's injuries included a broken tooth, a missing tooth, a "busted" eardrum, and numerous bruises and abrasions from Robinson's head down to her legs.

Evidence was introduced showing that appellant, Wallace, and "Lucky" were members of the Aryan Brotherhood (AB) and that Wallace had rank over appellant within that organization.

Appellant was, therefore, obligated to carry out Wallace's orders without question as long as the orders were "AB-sanctioned" orders.

Appellant urges that the evidence is insufficient to support his conviction because he acted under duress, because Robinson went with him voluntarily, and because appellant had no intent to inflict bodily injury on Robinson. Appellant cites TEX. PENAL CODE ANN. § 8.05 (West 2011) in support of his duress argument. Section 8.05(a) provides, "It is an affirmative defense to prosecution that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." Although there was evidence that appellant would suffer consequences for disobeying Wallace's orders, there was no evidence in the record of a threat of imminent death or serious bodily injury. Furthermore, Section 8.05(d) provides that the defense of duress is not available "if the actor intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subjected to compulsion." With respect to appellant's contention that Robinson went with him voluntarily, we conclude that there is more than ample evidence from which a rational jury could have determined that Robinson did not voluntarily go with appellant and that Robinson was abducted. Finally, although the evidence does not show that appellant actually inflicted bodily injury on Robinson, the jury could have found from the evidence presented that appellant had the intent to inflict bodily injury or terrorize Robinson or that appellant acted as a party to the offense. We hold that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and that the evidence is sufficient to support appellant's conviction. The fifth and sixth points of error are overruled.

*Jury Charge*

Appellant contends in his second point of error that the trial court erred in refusing to give a jury instruction on the defense of duress. It is well settled that a defendant is entitled to an instruction on every defensive issue raised by the evidence, regardless of whether that evidence is strong, feeble, unimpeached, or contradicted. *Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007); *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *Sanders v. State*, 707 S.W.2d 78, 80 (Tex. Crim. App. 1986); *Warren v. State*, 565 S.W.2d 931 (Tex. Crim. App. 1978). Duress, however, was not raised by the evidence in this case. There was no evidence that appellant was compelled to act by any threat of imminent—meaning immediate—death or serious bodily injury. *See* Section 8.05(a); *Ramirez v. State*, 336 S.W.3d 846, 851–52 (Tex.

6

App.—Amarillo 2011, pet. ref'd). Furthermore, duress was not an available defense under the circumstances of this case because appellant, through his membership in the Aryan Brotherhood, "placed himself in a situation in which it was probable that he would be subjected to compulsion" and to receiving orders from Wallace. *See* Section 8.05(d). The trial court did not err in refusing to instruct the jury on the affirmative defense of duress. Appellant's second point of error is overruled.

In his fourth point of error, appellant contends that the trial court erred by including the theory of parties in the application paragraph of the jury charge because such language was not contained in the indictment. An indictment need not allege the theory of parties in order for the defendant to be convicted as a party, and a trial court may charge the jury on the theory of parties even though that theory was not included in the indictment. TEX. PENAL CODE ANN. § 7.01(c) (West 2011); *Adames*, 353 S.W.3d at 861. There was evidence that appellant acted in conjunction with others in the commission of the offense and, thus, that appellant was a party to the offense. Because the parties charge was authorized by law and supported by the evidence, the trial court did not err in charging the jury on the law of parties and authorizing the jury to convict appellant as a party to this offense. Appellant's fourth point of error is overruled.

*Evidentiary Objections*

Appellant urges in his first point of error that the trial court erred in admitting testimony that appellant was a member of the Aryan Brotherhood. The State asserts that appellant failed to preserve this issue because he did not obtain a running objection or object each time the Aryan Brotherhood was mentioned and because defense counsel questioned witnesses regarding the Aryan Brotherhood. We disagree. Appellant filed a motion in limine regarding his membership in the Aryan Brotherhood, and the trial court granted appellant's motion in limine prior to trial but specifically stated that it was not ruling on the admissibility or inadmissibility of such evidence. During trial, the attorneys approached the bench to discuss the issue outside the hearing of the jury. Defense counsel requested a ruling "on the admissibility" of evidence relating to the Aryan Brotherhood, and the trial court announced its ruling at that time. When an adverse ruling regarding the admissibility of evidence is obtained at a hearing held outside the presence of the jury, no further objections need be made in the presence of the jury to preserve the issue for appellate review. TEX. R. EVID. 103(a)(1); *Geuder v. State*, 115 S.W.3d 11, 13–15 (Tex. Crim. App. 2003). Defense counsel's questioning of witnesses regarding the Aryan

Brotherhood occurred after the trial court had ruled that the evidence was admissible. Appellant did not waive the issue.

With respect to admissibility, appellant contended that evidence referencing the Aryan Brotherhood was not relevant to this case and was unduly prejudicial. Appellant relies, in part, upon *Dawson v. Delaware*, 503 U.S. 159 (1992). In *Dawson*, the Supreme Court held that the admission of a stipulation during the sentencing phase of trial violated the defendant's constitutional right to freedom of association where the narrow stipulation merely showed that the defendant was a member of the Aryan Brotherhood, a prison gang, but failed to show the relevance of such membership. 503 U.S. at 165–68. The Court in *Dawson* concluded, however, that the Constitution does not erect a per se barrier to the admission of evidence at sentencing regarding gang membership. *Id.* at 165. In the present case, appellant's membership in the Aryan Brotherhood was offered during the guilt/innocence phase of trial for the relevant purpose of showing appellant's motive for committing the crime. Thus, *Dawson* is distinguishable from the present case. *See, e.g., Mason v. State*, 905 S.W.2d 570, 576–77 (Tex. Crim. App. 1995) (discussing *Dawson* and upholding the admission of evidence of the defendant's membership in the Aryan Brotherhood at the punishment phase of trial because such evidence was shown to be relevant).

Appellant also relies upon the Texas Rules of Evidence in support of his contentions. *See* TEX. R. EVID. 401, 403, 404. The Texas Court of Criminal Appeals rejected similar arguments in *Vasquez v. State*, 67 S.W.3d 229, 239–40 (Tex. Crim. App. 2002), as did the court of appeals in *McCallum v. State*, 311 S.W.3d 9, 14–16 (Tex. App.—San Antonio 2010, no pet.). In each of these cases, the court ruled that evidence of the defendant's gang membership was relevant to show motive and was not unfairly prejudicial.

In *Vasquez*, the court upheld the admission of evidence that the defendant was a member of the Mexican Mafia where such gang affiliation was relevant to show a motive for the gang-related crime and, though prejudicial, was not unfairly prejudicial. 67 S.W.3d at 239–40. In that case, an accomplice witness testified that the defendant was a member of the Mexican Mafia and that the defendant told the accomplice that the victim had to be killed because she failed to pay a tax on the sale of illegal drugs that was collected by the Mexican Mafia. *Id.* at 232.

In *McCallum*, the court upheld the admission of evidence that the defendant was a member of the Aryan Brotherhood where the evidence indicated that the defendant had attacked

the victim because the victim "was 'false-claiming' regarding his prison involvement with other white supremacists." 311 S.W.3d at 15. The court also determined that, under Rule 403, the evidence was not unfairly prejudicial as it was not introduced in an attempt to show that the defendant was a bad person and that he acted in conformity with that character simply because of his affiliation with the Aryan Brotherhood. *Id.* Unfair prejudice exists only when the evidence has an undue tendency to suggest decision on an improper basis—commonly, though not necessarily, an emotional one. *Vasquez*, 67 S.W.3d at 240.

Likewise, we hold that appellant's affiliation with the Aryan Brotherhood was relevant and that the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice. Appellant's membership in the Aryan Brotherhood and his obligation to follow Wallace's orders because of their rank within that organization were relevant to show appellant's motive for the crime. The evidence showed that Wallace gave various orders to appellant relating to this crime, including putting Robinson in the trunk. Evidence of appellant's membership in the Aryan Brotherhood was offered to show appellant's motive, was not introduced to show character conformity, does not violate Rule 404, and was not unduly prejudicial. Thus, the trial court did not abuse its discretion in admitting evidence regarding appellant's membership in the Aryan Brotherhood. Appellant's first point of error is overruled.

In his third point of error, appellant argues that the trial court erred when it permitted Franklin to testify regarding Wallace's out-of-court statements. At trial, appellant objected that the testimony constituted inadmissible hearsay. The State asserted that the statements made by Wallace were admissible under TEX. R. EVID. 801(e)(2)(E). Rule 801(e)(2)(E) provides that a statement is not hearsay if the statement is offered against a party and was made "by a co-conspirator of a party during the course and in furtherance of the conspiracy." The statements about which appellant complains were statements that Franklin heard Wallace say while Wallace was looking for Robinson and while he was giving instructions to appellant regarding what to do after locating Robinson. These statements were admissible under Rule 801(e)(2)(E). Furthermore, Wallace's statement that he would "be damned" if Robinson left him with just a note was not offered to prove the truth of the matter asserted. Moreover, appellant did not object when Robinson or Holliday testified regarding similar out-of-court statements made by Wallace.

We note that, on appeal, appellant also cites *Crawford v. Washington*, 541 U.S. 36 (2004), and argues that the admission of Wallace's statements violated appellant's right to

9

confront the witnesses against him because Wallace did not testify at appellant's trial. Appellant did not preserve this contention for review because he did not make any such objection at trial. TEX. R. APP. P. 33.1; *Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (hearsay objection does not preserve Confrontation Clause issue). Moreover, the statements were not testimonial in nature and, therefore, did not violate the Confrontation Clause or the mandate of *Crawford*. Appellant's third point of error is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.

TERRY McCALL

JUSTICE

April 26, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.