Filed 8/25/14  P. v. Nunez CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049908 |
| v. | (Super. Ct. No. FVI020950) |
| FRANCISCO XAVIER NUNEZ and CEASAR ANTHONY SANTILLAN, | O P I N I O N |
| Defendants and Appellants. | |

Appeals from judgments of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Judgments affirmed in part and reversed in part.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant Francisco Xavier Nunez.

Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant Ceasar Anthony Santillan.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Nathasha Cortina and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

In a single trial with separately impanelled juries, defendants Francisco Xavier Nunez and Ceaser Anthony Santillan were found guilty of first degree murder, carjacking, robbery, kidnapping during a carjacking, kidnapping to commit robbery, and possession of a firearm by a felon.  As to the murder charge both juries returned true findings on special circumstance allegations of murder during the commission of robbery, kidnapping during a carjacking, and carjacking.  In addition, as to all but the weapon possession charge Nunez's jury also returned true findings on several firearm enhancement allegations.  Santillan's jury found only the allegation that a principal was armed with a firearm to be true.  The trial court sentenced each defendant to life in prison without the possibility of parole for the murder, plus additional terms on the remaining crimes.

Defendant Nunez raises three issues in his appeal.  He contends (1) the court erred in denying his motion for self-representation, (2) since count 2 (carjacking) is a lesser included offense of kidnapping for carjacking (count 4) his conviction on count 2 must be reversed, and (3) there were several sentencing errors.  As to the denial of his motion for self-representation, even if the court erred, he subsequently waived the error by retaining private counsel.  Count 2 (carjacking) should be stricken.  And the abstract of judgment must be corrected to cure other sentencing errors contained in it.

Defendant Santillan contends (1) the court erred in denying his motion for a mistrial when an officer mentioned his request for a lawyer during his interrogation, and (2) the court erred in admitting evidence of his gang membership.  Any error created by the officer's unfortunate attorney reference was properly cured by the court's instructions to the jury.  Gang membership was relevant and thus properly admitted.

FACTS

Three persons were involved in the crimes: Nunez, Santillan, and the latter's girlfriend Alysha Reyez. Before trial Reyez pleaded guilty to voluntary manslaughter and the use of a firearm; she was sentenced to 15 years. She testified for the prosecution.

Nunez owed Reyez "a couple hundred" dollars. Santillan and Reyez went to see Nunez to collect the money; Nunez told them he did not have the money but he would commit a robbery to get the money. Nunez entered the Ford Taurus driven by Santillan and saw a shotgun kept by Reyez. He asked Reyez if she had anything smaller than the shotgun and she told him she also had a handgun. She inserted a clip into the handgun and gave it to Nunez. They started driving around the area looking for someone to rob.

When they stopped at a liquor store to buy cigarettes, they saw a truck parked next to them; Nunez instructed Santillan to follow it. They followed the truck for a short distance to a market across the street. They parked, facing the truck, and Nunez got out; the driver of the truck, Armando Naranjo, was also outside his truck when Nunez put the handgun to Naranjo's back. Nunez brought Naranjo to Taurus and he and Santillan placed him in the front seat. Nunez got into the truck and the others followed him.

Nunez eventually stopped the truck and the Taurus followed suit. Naranjo was taken out of the car and Reyez and Santillan searched him for money and found about $200. They then placed Naranjo in the back of the truck, which was equipped with a hard top, and Nunez locked the top. Nunez again drove the truck with Reyez and Santillan following him in the Taurus. They drove for "a few hours" until they arrived at a location designated as "Day Creek Channel." In this remote area Nunez stopped the truck and Santillan stopped the Taurus. Nunez exchanged the handgun for the shotgun,

3

which was still in Reyez's possession.  Nunez then opened the hard top of the truck and Naranjo got out.  Naranjo immediately started to run with Nunez chasing him.  Nunez shot and killed Naranjo.  Santillan drove the truck to pick up Nunez and Reyez followed him in the Taurus.

Approximately two months later, Detective Rod Medley, investigating the disappearance of Naranjo, spoke to Reyez who directed him to the area where the murder was committed.  They found the decomposed and scattered remains of Naranjo.  DNA evidence identified the remains as Naranjo.

After the commission of the murder, Reyez drove Nunez to his home in the high desert, Santillan followed in the truck.  The following day, Reyez and Santillan drove the truck to the house of a friend, Cecilia Zamora, and removed the tire rims, speakers, and stereo equipment.  Santillan never recovered the truck and, eventually, Zamora had the truck towed to impound.

## DISCUSSION

*1. Nunez's appeal*

*a. Any error in the denial of Nunez's request for self-representation was waived.*

Nunez argues that denial of his *Faretta* motion (*Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562]) commands reversal of his conviction.  We disagree.  Although his motion for self-representation was unequivocal at first, after he conferred with his court appointed lawyer, the request became more equivocal.  But we need not decide whether his somewhat equivocal response, after the court denied his motion, detracts from the unequivocal nature of his request.  This is because Nunez subsequently retained his own lawyer and did not renew the motion.  This constituted a waiver of any error.

4

A substantial time before trial, his court appointed attorney advised the court that Nunez wished to represent himself. In response to the court's question, Nunez stated his lawyer had failed to file certain motions he had requested and expressed frustration about delays in getting to trial. He stated he did not trust his attorney and wished to have control of his life. The court explained to Nunez that his case was complex and very serious and that the lawyer appointed to represent him was well qualified. The court then examined Nunez as to his knowledge of DNA, explained the circumstances causing the delays and the limitations on a self-represented defendant in developing a defense. Nunez nevertheless stated he wished to "take my case pro per for the time being." The court examined Nunez as to his education, courtroom experience, ability to conduct legal research, and his understanding of the law. The court then stated, "I'm going to find that you are not able to represent yourself on this matter."

The court explained its reasons: the seriousness of the offense, legal concepts involved which were beyond Nunez's ability to deal with, and the potential for a life sentence. Counsel then suggested he talk to defendant. Thereafter, the court reconvened and the court asked whether they had enough time to talk; Nunez acknowledged they did. The court then inquired, "Are things better?" Nunez responded, "I guess."

By the time trial was about to start, Nunez had retained Steven Peretz as his attorney. Before jury selection started, Nunez requested a "*Marsden* hearing." The court pointed out that *Marsden* (*People v. Marsden* (1970) 2 Cal.3d 118) does not apply to privately retained counsel. (See *People v. Maciel* (2013) 57 Cal.4th 482, 512-513.) During further discussions between the court, counsel, and Nunez, the latter stated, "I do not want him as my attorney, but I'll go with him. He — he would be able to do it better than I would."

The factual sequence here is similar to that presented in *People v. Weeks* (2008) 165 Cal.App.4th 882 (*Weeks*). There the court erroneously denied a *Faretta*

5

motion. The appellate court acknowledged that "[g]enerally, denial of a timely and unequivocal request to proceed in pro. per. is reversible per se." (*Id*. at p. 887.) But after the trial court had erroneously denied the *Faretta* motion, defendant appeared at trial with retained counsel. The court noted "the error may be waived when the defendant later appears at trial with retained counsel, who asks to be substituted in for appointed counsel. [Citations.] A '*Faretta* right, once asserted, may be waived or abandoned.' [Citation.] A defendant may, by his or her conduct, indicate abandonment or withdrawal of a request for self-representation." (*Ibid.*)

*Weeks* noted that "[i]n *People v. Stanley* [(2006)] 39 Cal.4th 913, the defendant's request for self-representation arose in the course of his *Marsden* motion to substitute his court-appointed attorney with two retained counsel. [Citation.] The court here granted appellant's request to substitute counsel and appellant did not raise the pro se issue again. [Citation.] The Supreme Court held that the motion for substitution of counsel functioned as an acceptance of new counsel and without bringing up the pro se issue after the substitution, appellant had waived it, in favor of counsel. [Citation.]" (*Weeks, supra,* 165 Cal.App.4th at pp. 887-888, fn. omitted.)

Nunez's statement, just before trial was to start, "I do not want him as my attorney, but I'll go with him. He — he would be able to do it better than I would" indicates an abandonment of any desire to proceed as a self-represented defendant.

*b. The defendants' convictions of carjacking (count 2) must be reversed.*

Both defendants were convicted of carjacking (Pen. Code, § 215; count 2; all further undesignated statutory references are to this code) and of kidnapping during a carjacking (§ 209.5; count 4). The court imposed a sentence of 18 years on count 2, but stayed the sentence (§ 654, subd. (a)). In his opening brief, Nunez notes and the Attorney General agrees, carjacking is a necessarily included offense of kidnapping during a carjacking and therefore the trial court should have dismissed his carjacking conviction in

6

count 2.  (*People v. Ortiz* (2002) 101 Cal.App.4th 410, 415; *People v. Contreras* (1997) 55 Cal.App.4th 760, 765.)  This error also applies to Santillan.  The convictions on count 2 must be reversed.

### c. *Nunez's abstract of judgment must be corrected.*

The reversal of Nunez's conviction on count 2 (§ 215) requires correction of his abstract of judgment.

Nunez and the Attorney General also agree the abstract is in error in noting the sentence on count 4 (kidnapping during a carjacking; § 209.5) is life in prison *without* the possibility of parole.  Rather, the punishment for this crime is life in prison *with* the possibility of parole.  This is consistent with the statutory sentence, the court's pronouncement of sentence, and the minute order reflecting that sentence.

Again, Nunez and the Attorney General agree there was error in imposing two 1-year prior prison terms where the court imposed both a 5-year term under section 667, subdivision (a)(1), and a 1-year term under section 667.5, subdivision (b), on the same prior conviction.  (*People v. Jones* (1993) 5 Cal.4th 1142, 1150.)

The abstract of judgment refers to count 5 as being a violation of section 209, subdivision (b)(1), "kidnap to commit robbery/rape."  The conviction was for kidnapping to commit robbery.  Thus, the word "rape" should be deleted from the abstract.  Again the Attorney General concurs this correction is appropriate.

Both sides agree the abstract of judgment erroneously states Nunez was to pay $505 for his presentence investigation report.  The court stated, I "[f]ind that you do not have the money or means to reimburse court appointed counsel or to pay the cost of investigative costs."

Although the Attorney General disagrees, we also conclude Nunez's abstract of judgment should reflect the $3,654.56 victim restitution fine, payable to the Victim Compensation Board is the joint and several liability of both Nunez and Santillan.

7

This is reflected in Santillan's abstract of judgment and was clearly the intention of the court as reflected in the transcript of Santillan's sentence.

## 2. Santillan's appeal.

### a. The court did not err in denying Santillan's motion for a mistrial.

When the prosecution examined Detective Medley about his interrogation of Santillan, the following exchange took place: "Q: Did you ask him, again, why he was writing about Shady? [¶] A: Yes. [¶] Q: What did he say? [¶] A: At the end of the conversation or — [¶] Q: Towards the end of the conversation when you re-asked about Shady. [¶] A: He told me that he would like to speak with an attorney."

No objection was made and the questioning continued, covering some seven pages of the transcript. After the prosecutor finished his questions, Santillan's attorney started his cross-examination whereupon the court invited counsel to the bench and noted, "Now, here is the thing that I want to do as soon as possible. The detective said something about Mr. Santillan asking for a lawyer." The court then inquired, "Do you want me to say anything to the jury?" Santillan's lawyer stated, "I was going to make a motion for a mistrial." After some further exchanges, the court stated, "Assuming that I deny that motion, would you want me to advise this jury to disregard that?" Santillan's lawyer answered in the affirmative. The court continued: "I'm going to strike it for the record and tell them to disregard it." Santillan's lawyer responded, "That's fine."

The court then instructed the jury that the statement Santillan asked for a lawyer was stricken and explained, "When I order something stricken, I mean that now it's taken out of the record for the purposes of this trial. . . . [¶] Whenever I strike something and tell you that it's no longer in evidence, then you are to disregard that and treat it as though you've never heard it, not let it enter into your consideration of that

8

which is evidence." There was no further reference to the stricken phrase during the remainder of the trial.

Santillan argues *Doyle v. Ohio* (1976) 426 U.S. 610 [96 S.Ct. 2240, 49 L.Ed.2d 91] (*Doyle*) compels a reversal. We disagree. The issue in *Doyle* was "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* [*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694]] warnings at the time of his arrest." (*Id.* at p. 611, fn. omitted.) The court concluded "that use of the defendant's post-arrest silence in this manner violates due process, and therefore reverse[d] the convictions." (*Ibid.*) This is quite different from what happened here.

The facts here are analogous to those in *Greer v. Miller* (1987) 483 U.S. 756 [107 S.Ct. 3102, 97 L.Ed.2d 618] (*Greer*), except that in *Greer* defendant had also objected to a reference to defendant's silence. The *Greer* court noted, "It is significant that in each of the cases in which this Court has applied *Doyle*, the trial court has permitted specific inquiry or argument respecting the defendant's post-*Miranda* silence." (*Id.* at p. 764.) The *Greer* court continued: "In contrast to these cases, the trial court in this case did not permit the inquiry that *Doyle* forbids. Instead, the court explicitly sustained an objection to the only question that touched upon [the defendant's] postarrest silence. No further questioning or argument with respect to [the defendant's] silence occurred, and the court specifically advised the jury that it should disregard any questions to which an objection was sustained. Unlike the prosecutor in *Doyle*, the prosecutor in this case was not 'allowed to undertake impeachment on,' or 'permit[ted] . . . to call attention to,' [the defendant's] silence. [Citation.] The fact of [the defendant's] postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no *Doyle* violation occurred in this case." (*Id.* at pp. 764-765, fns. omitted.)

9

Although Santillan strives mightily to distinguish this case from *Greer*, we fail to see a distinction. Here also, the court instructed the jury to disregard the answer, the prosecutor was not allowed to call attention to the offensive statement and made no attempt to do so, and the statement "was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." (*Greer, supra,* 483 U.S. at pp. 764-765.) There was no *Doyle* error.

　　*b. Allowing examination of Santillan's gang membership during his cross-examination was not an abuse of discretion.*

　　Santillan wrote letters to Reyez while he was in jail relating to disposition of the proceeds of the robbery. In his letters he made several references to his gang, an affiliate of the Mexican Mafia. Before presenting this evidence and outside the presence of the jury, the parties argued whether it would be admitted. Santillan objected that under Evidence Code section 352, the probative value of the evidence was outweighed by its prejudice. The court ruled the evidence would be appropriate.

　　During cross-examination of Santillan, the prosecutor questioned him about the references to gang terminology in the letters and gang tattoos on his body. There was no further objection. He now argues the court erred in permitting this evidence and that the error was sufficient to command a reversal of his conviction. We disagree.

　　The gang references could be interpreted as threats to Reyez or as calling upon her loyalty to the gang to motivate her to comply with the requested assistance. Undoubtedly the references did not assist Santillan. But the question of whether to admit the evidence under Evidence Code section 352 was subject to the trial court's discretion. And "[d]efendant has not shown that the trial court ""'exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'"" [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 869.)

10

Santillan relies on *Dawson v. Delaware* (1992) 503 U.S. 159 [112 S.Ct. 1093, 117 L.Ed.2d 309] for the proposition that it is error to introduce evidence of gang membership where membership, as such, is not an issue. But that case held it was error to introduce the evidence where the evidence was "totally without relevance" in the sentencing proceeding where it was introduced. (*Id.* at p. 165.) Here, as noted, the evidence was relevant in showing Santillan's attempt to threaten Reyez to dispose of physical evidence obtained in the robbery. Other cases relied on by Santillan are *People v. Hernandez* (2004) 33 Cal.4th 1040 (*Hernandez*) and *People v. Cardenas* (1982) 31 Cal.3d 897 (*Cardenas*). In *Hernandez*, while recognizing the unique prejudice that may ensue if the jury that determines guilt also learns of the defendant's status as a person with one or more prior convictions (*Hernandez, supra,* 33 Cal.4th at p. 1048), held where "the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense" (*ibid.*), bifurcation of the trial is not required. And *Cardenas* held that where the evidence was cumulative and the evidence defense witnesses were also gang members "added little to further the prosecution's objective of showing that the witnesses were biased because of their close association with appellant." (*Cardenas, supra,* 31 Cal.3d at p. 904.) Neither case persuades that the court here acted "'"""in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice."'"""" (*People v. Montes, supra,* 58 Cal.4th at p. 869.) *People v. Albarran* (2007) 149 Cal.App.4th 214, also relied upon by defendant, may be similarly distinguished. It reiterated the established rule "'[g]ang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.'" (*Id.* at p. 223.)

The court did not abuse its discretion in admitting the evidence.

11

DISPOSITION


The appellants' convictions for carjacking are reversed. Upon remand, the abstract of judgment for each appellant shall be amended to delete the conviction on count 2. In addition, appellant Nunez's abstract of judgment shall be further amended as follows: (1) specify the sentence on count 4 as life with parole; (2) delete the sentence for one of the prior prison term findings; (3) delete the reference to rape on count 5; and (4) delete the costs for the presentence investigative report and the victim restitution fine. The clerk shall send the amended abstracts of judgment to the Department of Corrections and Rehabilitation. In all other respects, both judgments are affirmed.


                                            RYLAARSDAM, ACTING P. J.

WE CONCUR:


BEDSWORTH, J.


ARONSON, J.


12